709 A.2d 112

Danny SON

v.

MARGOLIUS, MALLIOS, DAVIS, RIDER & TOMAR et al.

No. 33, Sept. Term, 1997.

Court of Appeals of Maryland.

April 17, 1998.

Reconsideration Denied June 4, 1998.

442

J. Stephen McAuliffe, III (Joseph M. Mott, Miles & Stockbridge, P.C., on the brief), Rockville, for petitioner.

Albert D. Brault, David G. Mulquin, Brault, Graham, Scott & Brault, L.L.C., Rockville; Barry J. Rosenthal (Bromberg, Rosenthal & Siegel, on brief), Rockville, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

On August 5, 1992, Danny Son was severely injured in an automobile accident. While helping to change a flat tire on the shoulder of the Capital Beltway, he was struck by a tractor-trailer. The accident left Mr. Son in a comatose condition for several weeks, and he remains a quadriplegic. With the assistance of an intermediary, Jennifer Park, Son's then-wife, Tae Yon Son, employed Gary A. Stein, a partner in the law firm of Margolius, Mallios, Davis, Rider & Tomar, to represent her husband and her in obtaining compensation for their respective injuries. Mr. Stein commenced litigation, which, on December 30, 1993, was settled for $4,850,000.

The issues now before us arise from the manner and circumstances under which the settlement proceeds were distributed, in particular from the fact that, although Mr. Stein showed on the settlement sheet an attorney's fee of 28.5%, amounting to $1,382,250, and no amount paid to Ms. Park, the firm actually kept as an attorney's fee only $1,139,750—23.5% of the settlement amount, and paid Ms. Park $242,500, constituting an additional 5% of the settlement amount. Contending that he had never authorized any payment to Ms. Park and that he was unaware that such a payment had been made until nine months later, Mr. Son filed suit in the Circuit Court for Montgomery County against Stein, the firm, the other partners in the firm, Park, and Park's corporation, seeking to recover the $242,500 paid to Park, the $1,139,750 retained by

the firm as an attorney's fee, and other compensatory and punitive damages.

In Count I of his complaint, Mr. Son claimed that Ms. Park solicited Ms. Son to retain Stein and Stein's firm in violation of the State Barratry Law (Maryland Code, § 10–604(a)(1) of the Business Occupations Article (1995 Repl.Vol.)), that the payment to Ms. Park was an unlawful referral fee, that the disbursements by Stein implemented an illegal fee-splitting agreement that was in contravention of the public policy of Maryland, and that the defendants should not be permitted to retain any of the benefits from the agreement. Counts II through V charged a variety of torts, all based principally on the asserted concealment from Son of the allegedly illegal agreement. In Count II, he charged the defendants with civil conspiracy to enter into the unlawful agreement and to conceal it from him; Count III charged the firm and its partners with constructive fraud by deceiving Son with respect to the fee-splitting agreement; Count IV charged them with actual fraud in failing to disclose the agreement to compensate Ms. Park; and Count V charged the firm and its partners with negligence in failing to disclose the agreement.

Mr. Son filed a motion for summary judgment with respect to Count I of his complaint. Ms. Park and her corporation filed a cross-motion for summary judgment as to Counts I and II—the only ones that applied to them. The lawyer-defendants moved for summary judgment on all five counts. In their respective cross-motions, the defendants assumed that the sole basis of Son's complaint was his assertion that the conduct of Ms. Park or the lawyers constituted barratry, in violation of § 10–604 of the Business Occupations Article. They posited that, as a matter of law, that was not the case and that, as a result, none of the counts applicable to them sufficed to constitute a cause of action. In December, 1995, the court, in two brief orders assigning no reasons, denied Son's motion, granted those filed by the defendants, and entered judgment in favor of the defendants.

The Court of Special Appeals affirmed the summary judgments entered on Count I, but reversed those entered on the other four counts and remanded the case for further proceedings as to them. *Son v. Margolius,* 114 Md.App. 190, 689 A.2d 645 (1997). With respect to Count I, the court concluded (1) that the alleged arrangement between Ms. Park and the lawyers would be voidable because of illegality only if the arrangement proceeded from conduct that amounted to barratry under the Maryland statute, and (2) that it would be voidable on other public policy grounds only if it amounted to a violation of Rule 5.4 or Rule 7.2 of the Maryland Lawyer's Rules of Professional Conduct (MLRPC) *and* those rules constituted a sufficient statement of public policy to render void any contract in violation of them. The court held that, because there was no evidence to indicate that Ms. Park ever solicited Mr. or Ms. Son to employ Mr. Stein or his law firm and because solicitation was a requisite element of barratry under the Maryland statute, the conduct complained of by Mr. Son did not constitute barratry. Based on its recent holding in *Post v. Bregman,* 112 Md.App. 738, 686 A.2d 665 (1996), the court further concluded that, even if the alleged arrangement amounted to a violation of MLRPC Rule 5.4 or 7.2, the violation of those rules "do not provide a basis for voidance of a contract." *Son v. Margolius, supra,* 114 Md.App. at 219, 689 A.2d at 659. Accordingly, it held, as a matter of law, that Son was not entitled to void the agreements made by him or on his behalf based on illegality or violation of public policy.

The other counts, the appellate court noted, did not depend on whether the agreement to pay Ms. Park a 5% fee constituted an illegal fee-splitting arrangement, but rested instead on the assertion that the parties had concealed that agreement from Mr. Son and had thereby misrepresented Ms. Park's status and the true fee agreement with the lawyers. The court concluded that although the matter was in dispute, there was evidence in the record from which a trier of fact could find that a fee-splitting agreement did exist between Ms. Park and the lawyers, and that there was a dispute of fact as to whether Ms. Park and the lawyers concealed the arrangement from

Mr. Son and misrepresented the actual fee arrangement. In this latter regard, the court concluded that (1) the impact of any constructive knowledge that Mr. Son had of any such agreement was not raised in the circuit court, and (2) there was a genuine dispute of fact as to whether a power of attorney that Mr. Son gave to his wife, that might have provided a basis for her to agree to a fee-splitting arrangement between Ms. Park and the lawyers, was valid. The lack of a barratry violation, the court held, did not, of itself, suffice to render the four tort actions non-viable. The factual disputes, moreover, made summary judgment on the four tort counts impermissible.

Son apparently acquiesced in the appellate court's conclusion that Count I could not be founded upon a violation of MLRPC Rules 5.4 or 7.2, and the defendants apparently acquiesced in that court's decision as to the other counts, for no petitions for *certiorari* were filed as to those matters. Son filed a petition for *certiorari* limited to a narrow issue regarding the offense of barratry—whether the element of solicitation is satisfied when "there is no dispute that the alleged barrator engaged in constructive solicitation by regularly holding herself out to the public as one who engages in the practice of charging a fee for selecting a lawyer, and when contacted in this case demanded a fee before selecting the lawyer."

This Court granted the petition and, on November 10, 1997, heard argument on the limited issue raised in the petition. By then, however, we also had pending before us review of the Court of Special Appeals decision in *Post v. Bregman,* upon which that court relied in its decision in this case, raising the broader issue of whether agreements entered into by lawyers that were in contravention of applicable MLRPC rules could be declared void as against public policy. Recognizing that that issue arguably had been raised by Son in his complaint and being of the view, after having heard argument in *Post v. Bregman,* that the Court of Special Appeals may have erred in its conception and application of MLRPC, we took the unusual step of directing reargument in this case on the question of

whether the alleged arrangement between Ms. Park and the lawyers was void against the public policy expressed in MLRPC Rules 5.4 and 7.2. All that is before us now is the Court of Special Appeals decision affirming the judgment entered on Count I of the complaint; neither our initial grant of *certiorari* nor our order for reargument encompassed that court's rulings with respect to the other four tort counts. For the reasons explained in this Opinion, we shall reverse the judgment of the Court of Special Appeals as to Count I.

## UNDERLYING FACTS

As noted, this case comes to us on summary judgment, and, in a nutshell, that is the problem. As the Court of Special Appeals pointed out, certain material facts are in dispute. We must consider the evidence produced in support of or in opposition to the defendants' motions in a light most favorable to Mr. Son. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608, 614 (1985).

Mr. Son and his then-wife, Tae Yon Son, are of Korean heritage. Although they spoke some English and, through the operation of independent businesses, presumably had some understanding of American business culture, English was not their primary language, and they were far more comfortable with the local Korean community than with broader American society. The injuries suffered by Mr. Son as a result of the accident were catastrophic, being both immediately life-threatening and permanently disabling to him and having a dramatic impact on Ms. Son as well. Mr. Son was comatose for at least several weeks. He would need substantial medical treatment, followed by rehabilitation therapy and overall assistance. The medical bills, some of which were reduced, ultimately exceeded $500,000, and a Life Care Plan was eventually prepared for him, involving continuing future medical care and general assistance.

Faced with the immediate and overwhelming set of problems arising from the accident, Ms. Son contacted Ms. Park for assistance. Jennifer Park was well known in the Korean

community generally as someone who helped people of Korean heritage deal with problems of one kind or another. She was also known to Ms. Son, who had worked as a bookkeeper for Ms. Park for about two months in 1987, when Ms. Son first came to Maryland. Ms. Park said that she had been helping other Koreans for about 15 years and in a variety of ways, including helping them find a lawyer when they needed one, that she usually did not charge anything for her services, but that, in 1992, she began to charge fees. On at least one occasion, in June, 1992, Ms. Park had brought a possible wrongful death claim to Mr. Stein, who declined representation because he did not believe that the case had sufficient merit to warrant the effort.

Ms. Son contacted Ms. Park within two or three days after the accident, on August 7 or 8. Both Ms. Son and Ms. Park stated that the purpose of the call was to elicit Ms. Park's assistance in finding a lawyer. Ms. Son testified that she knew Ms. Park had helped people find an attorney, that she told Ms. Park that her husband had been in an accident, and that she asked Ms. Park to help her find a lawyer. Ms. Park testified similarly:

> "She tell me about the accident her husband have, a couple of days ago. And according to the doctor, she doesn't know whether Mr. Son will be survive or not. And their family wants to, you know, hire the lawyer, right away, 'cause she don't know where to go. And she ask me whether I could help her."

The following afternoon, Ms. Park met with the family—Ms. Son and some of Mr. Son's brothers and in-laws—at the hospital and explained that she would give them a list of two or three lawyers and let them decide which one was best, that she would go with them to talk to the lawyers and would work for the family, but that she intended to charge a fee, separate from any attorney's fee, in the amount of 10% of any recovery. When the family agreed to that arrangement, Ms. Park gave Ms. Son a list of three lawyers—Mr. Stein and two lawyers whose names she got from the Yellow Pages of the telephone

book. Mr. Stein's name was first on the list. Ms. Park called him on August 9 or 10 and informed him about Mr. Son's injuries. She and Ms. Son apparently met with Stein on August 12.

On August 12, 1992, Ms. Son signed three agreements. One, entitled "Employment Contract," was written in Korean and was between the Sons and Ms. Park; it was signed by Ms. Son, for herself and for Mr. Son, and by Ms. Park. As translated later into English, it stated, in relevant part, that the Sons agreed (1) to employ Ms. Park "as the spokesperson and consultant for both of us so that to the best of her abilities, she can cooperate with both of us and the attorney we select in connection with the law suit filed to claim compensation for Danny Son's traffic accident ... and the matters related to the hospital during Danny Son's recovery of health," (2) to appoint Ms. Park as their representative to "prepare for any and all questions relative to the hospital and the law suit, and respond to the attorney and others on behalf of me and my husband upon consultation with us," and (3) to pay her for all her efforts 10% "of the total proceeds that I and my husband will receive, separately and apart from the attorney fees." According to Ms. Park, that agreement was signed on the morning of August 12 at Ms. Son's home, before Ms. Son ever met with Mr. Stein.

The other two agreements were retainer agreements signed only by Ms. Son, for herself and her husband. In both agreements, which were identical in all respects except as to the fee, the Sons employed the firm of Margolius, Mallios, Davis, Rider & Tomar to prosecute their claim for damages resulting from the accident. In one version, Ms. Son agreed to a fee "equal to 33⅓% (or 40% if case is tried) percent (33⅓–40%) of the total amount of any settlement or judgment obtained in the case." In the other version, which appears to be a copy of the first except for certain scratch-outs and interlineations relating to the fee, she assented to a fee "equal to 30% (or 35% if case is tried) percent (33⅓–40%) of the total

amount of any settlement or judgment obtained in the case." [1] The changes were initialed by Ms. Son and Mr. Stein. In her answer to Mr. Son's complaint, Ms. Park stated that the modifications were made by Ms. Son. There is no corroboration of that statement in the record, and there is nothing to indicate why both agreements were signed. When the three agreements were signed, Mr. Son was still comatose, or at least unable to communicate.

Mr. Stein testified that he was unaware of the written agreement between Ms. Son and Ms. Park when he met with Ms. Son in August. He said that later—"in the course of this litigation"—he was advised that she had a written agreement, but that he "was not privy to the specifics." He added that it was his understanding that Ms. Park had been engaged by the family to help Ms. Son and that "she was providing services for them, including finding lawyers for them and helping with logistical details of life." He assumed that the arrangement was a financial one but did not know what it was. Ms. Park directly contradicted that part of Mr. Stein's testimony. She said that she told Stein that she was charging the Sons a fee and that, because they could not afford to pay an hourly rate, she was charging "10 percent overall recovery." She added that Mr. Stein asked no questions about the services she was providing, but simply replied "very interesting." As we shall see, whatever may have been the state of Mr. Stein's knowledge early in the process, he clearly became aware of the details of the arrangement between Ms. Son and Ms. Park in November, 1992, for he then signed (and likely drafted) an agreement between the Sons and Ms. Park that not only spelled out very clearly what the arrangement was between those parties but obligated him to implement that arrangement.

---

1. The second agreement, being an apparent copy of the first, repeated the 33⅓% and 40% numbers in both places in the clause. The first time in the clause that the figures appeared, they were scratched out and replaced with the figures 30% and 35%. No such amendments were made as to the second mention of the figures, thus creating some facial ambiguity as to the fee.

On September 20, 1992, Ms. Park took to the hospital a General Power of Attorney that had been drafted by Mr. Stein and explained it to both Mr. and Ms. Son. Mr. Son's condition at the time is unclear. Both Ms. Park and Ms. Son testified that he had regained consciousness by then, which is supported by the fact that he "signed" the power of attorney before a notary, who attested that Son personally appeared and acknowledged the power of attorney to be his act. His signature on the power of attorney suggests, however, that he was at least physically frail, if not actually impaired in some way. It consists of two unconnected lines, a short one running in a southwesterly direction, and a longer one, below it, running in a southeasterly direction. The lines appear to be more scrawled than deliberately written, and, to the extent they constitute a signature, they are significantly different than the signature of Mr. Son that appears on the December 30, 1993 settlement sheet. The Court of Special Appeals commented that the two lines "are in no way intelligible as a signature in any known language" and suggested, as we do, that "the signatory was laboring under some form of impairment." *Son v. Margolius, supra,* 114 Md.App. at 198 n. 3, 689 A.2d at 649.[2]

In the power of attorney, Mr. Son appointed his wife as his attorney-in-fact with general authority, among other things, to enter into all manner of contracts, prosecute suits, and "take all steps and remedies necessary and proper for the conduct and management of [his] business affairs...."

On November 11, 1992, Ms. Son, Ms. Park, and Mr. Stein signed a "Consulting Agreement, Employment Contract and Assignment." The agreement was stated to be between Mr. Son "and family," denominated as "Clients," and Ms. Park. In several introductory "Whereas" clauses, it recited that (1) Mr.

---

2. In his complaint, Mr. Son asserted that, while he "was incapacitated, he was presented with a document by his wife upon which he placed his mark. [He] did not learn that this document ... was purported to be a General Power of Attorney until his present attorneys obtained a complete copy of his file from [the Margolius Law Firm] in December of 1994 and discovered [the document] in the file."

Son had been in a serious automobile collision, (2) the clients were "unable to speak English and are unversed and unfamiliar with dealing with nearly all aspects of the bureaucracy in the United States," (3) they require "numerous and extensive services and assistance in dealing with their day to day interactions with our health care system and social services system and in their interface with our legal system," (4) Park was well-versed in English and Korean and was willing and able to provide "the various, numerous and extensive services" to the clients "over an extended period of time," (5) the clients had no funds from which to compensate Park properly and would never be able to compensate her unless they obtain a substantial recovery as the result of the accident, (6) Park was willing to defer compensation and bear the risk of receiving none if no recovery was obtained by the clients, and (7) the Sons were willing "to assign to Ms. Park a nominal portion of six and one-half percent (6.5%) of any recovery they may receive from any source as result of their claims" and Ms. Park was willing "to provide her extensive consulting services to Clients in return for an assignment of said 6.5% of any recovery obtained, *unless the case is settled prior to trial in which case the consultant's fee is 5%.*" [3]

Upon those recitals, Ms. Son and Ms. Park, by their signatures, agreed that Ms. Park would act as a consultant to the Sons "to assist them in all activities necessary for the ultimate prosecution of their claims other than legal services." Those services were to include translation, "advocacy and negotiation with health care providers and community resources to assist clients in their day-to-day activities during the pending litigation, investigation services, research, paralegal support to the attorney representing Clients in their claim, acting as liaison between Clients' attorney and the Korean community and other support services to Clients and their attorney as may be required from time to time." The agreement obliged Ms. Park to "cooperate and work with Clients' attorney," carry out

---

3. The italicized language was added by interlineation and was initialed by Ms. Son, Ms. Park, and Mr. Stein.

"appropriate tasks based on her skills to assist in the pending litigation," and be available for any court proceeding, deposition, meeting with Koreans, "or any other time that her appearance is appropriate or requested" but made clear that Ms. Park was not "to be engaged in any activity that may be construed as providing legal services."

The balance of the agreement stated:

"3. By means of this Agreement, Clients' attorney is hereby authorized and instructed to pay to Consultant a sum equal to 6.5% of any recovery (including the present value of any structured settlement) *if the case is tried, or 5% if the case is settled* Clients receive from any source for the injuries sustained in the collision that occurred on August 5, 1992. Said sums are to be paid to Consultant before any sums are turned over to Clients.[4]

4. Any sums payable under the terms of this agreement are separate and apart from any fee agreement Clients may have reached with their attorney and the terms of this agreement are in no way related to such separate agreement Clients have with their attorney.

5. This agreement is to be construed under the laws of the State of Maryland and Consultant and Clients agree to indemnify and hold Clients' attorney harmless from any losses resulting from the terms of this Agreement."

The agreement was signed by Ms. Son and Ms. Park. Below their signatures appears the statement, signed by Mr. Stein: "I hereby agree to follow the terms of this agreement and to disburse funds to Jennifer Park in accordance with its terms when and if a recovery is obtained for Clients."

The record does not indicate who drafted this agreement, but there is certainly a fair inference that it was drafted by Mr. Stein or someone in his firm, rather than by Ms. Son or Ms. Park. Not only is it far more sophisticated than the earlier Employment Agreement drafted by Ms. Park but it

---

**4.** The italicized language was added by interlineation and was initialed by Ms. Son, Ms. Park, and Mr. Stein.

includes provisions specifically benefitting Mr. Stein and his firm, that have nothing directly to do with the services to be performed by Ms. Park. At least facially, it appears rather clearly to have been drafted either by a lawyer or by someone with legal drafting skills.

On December 3, 1992—just three weeks after the Consulting Agreement was signed—Ms. Son signed two new retainer agreements with the Margolius law firm. Except for the fee, the agreements are identical to each other and similar in most respects to the two agreements signed in August. The first agreement called for a fee of 28.5% of any settlement and 33⅓ % of any judgment obtained. The second agreement called for 23.5% of any settlement and 26.83% of any judgment. Unlike the August agreements, there were no interlineations in these agreements. The record does not indicate why two different agreements were signed and does not clearly establish which was intended to prevail.

The case was settled a year later, on December 1, 1993. Just prior to the settlement, in November, 1993, Mr. Stein prepared for Mr. Son a settlement analysis, showing Son his approximate net recovery, depending on varying settlement amounts ranging from $3 million to $5 million. From those amounts, deductions are shown for attorney's fees at the rate of 28.5%, legal costs of $22,000, medical bills of $500,000, and loans of $65,000. No deductions are shown for any payment to Ms. Park, notwithstanding the provision of the November, 1992 Consulting Agreement obligating Stein to pay 5% of any settlement amount to her. Contemporaneously, in an effort to convince the State Department of Health and Mental Hygiene to reduce by half its $125,607 subrogation claim for Medicaid benefits, Stein wrote to the Department on November 18, 1993, informing it, among other things, that "[t]he attorneys fees in this case are at a 33⅓% rate but we are discounting to 28½% to facilitate settlement and in light of the extreme hardship in this case and the enormous future needs of Danny Son." Nothing was said in that letter about any payment to Ms. Park. Stein did state that "[e]xpenses incurred to date total approximately $20,000."

On December 30, 1993, Stein prepared, and Mr. Son signed, a Settlement Sheet. That document shows the total recovery as $4,850,000, from which is deducted (1) an attorney's fee of 28.5%, or $1,382,250, (2) "Legal Costs" aggregating $24,865, and (3) outstanding medical bills aggregating $500,424. The amount remaining after those deductions, listed as "Net Recovery For Mr. & Mrs. Son," was $2,942,460. From that amount were deducted $50,000 to repay a loan, $17,000 for prior advances to Mr. Son, and $800,000, representing the cost of an annuity. The net balance, then, was $2,075,460. No amount was shown as payable to Ms. Park.

On January 11, 1994, the Margolius firm paid to itself, from its escrow account, a fee of $1,139,750, representing only 23.5%, and expense reimbursement of $16,648. The next day, Ms. Park incorporated her company, Park Consultants and Associates. Ltd., assigned to that company "that portion of the ... settlement proceeds previously assigned to [her] by the plaintiffs," and directed the Margolius firm "to distribute all such funds owed to me (the sum of $242,500) to Park Consultants and Associates, Ltd." In accordance with that direction, the firm, that same day, sent or delivered a check for $242,500 to Ms. Park's company.

One of the more significant disputes in the record concerns Mr. Son's knowledge of the arrangement to pay Ms. Park a fee based on the amount of recovery. The only documents calling for or revealing a fee to Ms. Park were signed by Ms. Son, not by her husband. Neither the settlement analysis prepared by Mr. Stein for Mr. Son nor the settlement sheet presented to and signed by Mr. Son reveal any fee owing to Ms. Park. Indeed, they both show an attorney's fee of 28.5%, which is inconsistent with one of the last two retainer agreements signed by Ms. Son. In his complaint, Mr. Son stated he did not learn that Ms. Park had been paid $242,500 from the settlement proceeds until September 1994, when his wife revealed that information in the course of a deposition taken in their then-pending divorce case. He alleged further in his complaint that he did not learn of the existence of the Consulting Agreement until November, 1994, when Ms. Park gave

deposition testimony in the divorce case. Although excerpts of the deposition testimony are attached as exhibits to the complaint, there is no corroboration in the record that Mr. Son first learned of the arrangement through those depositions. Ms. Son, indeed, contradicted that assertion. In other deposition testimony, given in this case, she said that she told her husband in September, 1993, that Ms. Park usually charged a fee of 10% but that she intended to charge them only 5%. She said that she also showed Mr. Son the Consulting Agreement but could not recall when that occurred.

## DISCUSSION

### Barratry

The issue that we initially took this case to consider is whether the Court of Special Appeals erred in concluding that the conduct of Ms. Park and Mr. Stein did not constitute the prohibited practice of barratry, in violation of § 10–604(a) of the Business Occupations Article. Section 10–604(a) provides, in relevant part:

"Without an existing relationship or interest in an issue:

(1) a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit; and

(2) a lawyer, except as provided in the Rules of Professional Conduct, may not:

(i) for personal gain, solicit another person to sue or to retain the lawyer to represent the person in a lawsuit;

(ii) directly or indirectly employ or in any way compensate or agree to employ or compensate any person ... for the purpose of having that person solicit or attempt to solicit clients for the lawyer;

(iii) knowingly represent a person who retained the lawyer as a result of solicitation prohibited under this section; or

(iv) cause a case to be instituted without the authority of a client."

Section 10–604 is a criminal statute. A person who violates it is guilty of a misdemeanor and is subject to incarceration for one year and a fine of $1,000. § 10–606(c).

The conduct proscribed by § 10–604 was first made a statutory offense in Maryland in 1908. *See* 1908 Md.Laws, ch. 413. Before then, the officious stirring up of, maintaining, or meddling in litigation in which a person had no interest constituted the common law crime of barratry, maintenance, champerty, or embracery, depending on the particular nature of the conduct. Blackstone defined "common barretry" as "the offense of frequently exciting and stirring up suits and quarrels between his majesty's subjects, either at law or otherwise." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND * 134. *See also* 1 WILLIAM HAWKINS, A TREATISE ON THE PLEAS OF THE CROWN 474 (1824): "[A] barrator is a common mover, exciter, or maintainer of suits or quarrels, either in courts, or in the country." As Hawkins makes clear, the offense required multiple or persistent conduct: "no one can be a barrator in respect of one act only; for every indictment for such a crime must charge the defendant with being *communis barractator.*" *Id.* at 475.

Maintenance, according to Blackstone, was a "near relation" to barratry and consisted of "an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it." 4 BLACKSTONE, *supra,* *135. The perniciousness of the conduct, he added, was that "it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression." *Id.* A particular species of maintenance was champerty, or *campi-partitio,* which Blackstone defined as "a bargain with a plaintiff or defendant *campum partire,* to divide the land or other matter sued for between them, if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense." *Id.* In Blackstone's day, the offense of maintenance was a broad one, characterized as "the purchasing of a suit, or right of suing" and was so abhorred that it formed one basis for the prohibition against assigning choses in action. *Id.* *135.

Hawkins, who treated the subject more extensively than Blackstone, included as maintenance "assist[ing] another with money to carry on his cause, as by retaining one to be of counsel for him, or otherwise bearing him out in the whole or part of the expense of the suit," saving a suitor from expense, as by persuading an attorney to represent the party *gratis,* and "endeavor[ing] to give, any other kind of assistance to either of the parties in the management of the suit depending between them." 1 HAWKINS, *supra,* at 455. Importantly, Hawkins noted that a person was not guilty of maintenance "for giving another friendly advice ... what counsellor or attorney is likely to do his business most effectually," for, he continued, "it would be extremely hard to make such neighbourly acts of kindness, which seem rather commendable than blame-worthy, to come under the notion of maintenance, which always seems to imply a contentious and over busy intermeddling in other men's matters." *Id.* at 455–56.

The broad scope of common law maintenance, as described by Hawkins, did not survive beyond the mid-Nineteenth Century. In *Findon v. Parker* 11 M. & W. 679 (1843), Lord Abinger, Chief Baron of the Court of Exchequer, opined that "[t]he law of maintenance, as I understand it upon the modern construction, is confined to cases where a man improperly, and for the purpose of stirring up litigation and strife, encourages others either to bring actions, or to make defences which they have no right to make." [5] *Id.* at 682. That statement from *Findon,* which essentially redefined maintenance to be the equivalent of Blackstone's conception of barratry, was adopted in Holmes's revision of James Kent's COMMENTARIES ON AMERICAN LAW (12th ed. 1873) at 480 and was favorably quoted by

---

5. Lord Abinger continued, in *dicta,* to observe that "if a man were to see a poor person in the street oppressed and abused, and without the means of obtaining redress, and furnished him with money and employed an attorney to obtain redress for his wrongs, it would require a very strong argument to convince me that that man could be said to be stirring up litigation and strife, and to be guilty of the crime of maintenance."

our predecessors in *Schaferman v. O'Brien,* 28 Md. 565, 574 (1868).

The statute, as enacted in 1908 and as it now appears, is somewhat more specific in its articulation. Section 10–604(a)(1) deals with the conduct of persons generally; § 10–604(a)(2) deals with the conduct of lawyers, in particular. Ms. Park's conduct must be measured under subsection (a)(1): without an existing relationship or interest in an issue, a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit. In one important sense, the statute is broader than the common law offense, as it proscribes even a single instance of solicitation whereas, as noted by Hawkins, *supra,* that was not the case at common law. As the Court of Special Appeals pointed out in *Schackow v. Medical–Legal Con. Serv.,* 46 Md.App. 179, 193–94, 416 A.2d 1303, 1312 (1980), however, the essence of barratry under the statute "is the *solicitation* of another to make a litigious claim...." It is undisputed in this record that Ms. Park did not solicit Ms. Son (or Mr. Son) to make a litigious claim, to sue, or to retain a lawyer. It was Ms. Son who, on her own, quite properly determined that she needed a lawyer and called Ms. Park for assistance in finding one. If there was any kind of solicitation arising from that contact, it was a legitimate solicitation on the part of Ms. Son.

Mr. Son seeks to find an unlawful solicitation on Ms. Park's part not from the telephone call by his wife but rather from (1) the alleged fact that Ms. Park held herself out in the community as a person who, for a fee, regularly assisted Korean people in finding lawyers, which, he claims, amounts to a constructive solicitation of Ms. Son to take advantage of that service, and (2) actively soliciting Ms. Son for a fee once Ms. Son made the initial contact. Both arguments miss the point of the statute and, to the extent relevant, the antecedent common law. The thrust of the offense is stirring up, meddling in, or maintaining litigation in which the person has no interest, for personal gain. The officious meddling and the personal gain are separate elements, and both must be satis-

fied. There is no evidence that Ms. Park engaged in any proscribed meddling, either generally or specifically. There is nothing in this record to indicate that Ms. Park ever solicited people to bring, maintain, or defend lawsuits in which she had no interest or that she ever held herself out as being willing to do so. The most that the record reveals she ever did was what she did in this case—assist members of the Korean community who had already determined that they needed or wanted a lawyer in finding one. Those people, had they known about the service and been able effectively to communicate with the persons operating it, could as easily, and appropriately, have received the same kind of assistance by calling a lawyer referral service operated by a local bar association. That is not what the Legislature intended to make criminal.

It is true that after 1992 Ms. Park began charging a fee for that service, at least when coupled with other services rendered by her, but, although the element of personal gain suffices to make the officious meddling unlawful, it does not make a permissive service barratry. The Court of Special Appeals was correct in holding that there was no unlawful solicitation by Ms. Park.

■ Section 10–604(a)(2), as noted, deals with the conduct of lawyers. A lawyer may not, for personal gain, solicit another person to sue or to retain the lawyer to represent the person in a lawsuit. There is no evidence that Mr. Stein, or anyone in his firm, engaged in that conduct. Ms. Park brought a potential case to Stein; he did not solicit Ms. Park, Ms. Son, or Mr. Son to bring suit or to retain him or his firm to bring a lawsuit. Section 10–604(a)(2) also prohibits a lawyer from employing or compensating a person to solicit clients for the lawyer. There is no evidence of that activity; nothing in this record even suggests that Mr. Stein, or anyone in his firm, ever paid Ms. Park to solicit clients. Finally, the statute prohibits a lawyer from representing a person retained "as a result of solicitation prohibited under this section." There being no such prohibited solicitation evident in this

record, representation of Mr. and Ms. Son by the lawyer defendants was not unlawful.

## Public Policy

The expanded issue we chose to address is whether the arrangement between Mr. Stein and Ms. Park, arising from the Consulting and Retainer agreements, constituted a violation of MLRPC 5.4 or 7.2 and was, for that reason void as against public policy. Although recognizing that the arrangement "may have" violated those rules, the Court of Special Appeals, relying on its opinion in *Post v. Bregman, supra,* 112 Md.App. 738, 686 A.2d 665, concluded that the violation of those rules "do not provide a basis for voidance of a contract." *Son v. Margolius, supra,* 114 Md.App. at 219, 689 A.2d at 659.

In *Post v. Bregman,* 349 Md. 142, 707 A.2d 806 (1998), we reversed the judgment of the Court of Special Appeals in that case and held (1) that MLRPC constituted a statement of public policy by this Court having the force and effect of law, (2) that a fee-splitting agreement between lawyers was subject to and must be in conformance with MLRPC Rule 1.5(e), dealing with those kinds of agreements, and (3) that enforcement of Rule 1.5(e) *"may* extend to holding fee-sharing agreements in clear and flagrant violation of [the rule] unenforceable." 349 Md. at 168, 707 A.2d at 818. We concluded that the rule was not a *per se* defense, rendering unenforceable otherwise valid fee-sharing agreements "because of rule violations that are merely technical, incidental, or unsubstantial or when it would be manifestly unfair and inequitable not to enforce the agreement." When presented with a defense under that rule, the court must look to all the circumstances, including, among other things, the nature of the violation, how it came about, the extent to which the parties acted in good faith, whether the violation has some particular public importance, and whether the client, in particular, would be harmed by enforcing the agreement. *Id.* It is evident that the Court of Special Appeals view that a violation of MLRPC Rules 5.4 and 7.2 cannot serve as a basis for voiding a fee-sharing contract is inconsistent with our holding in *Post v. Bregman* and cannot,

therefore, be sustained. We need, then, to engage in the analysis required by *Post v. Bregman.*

With three exceptions, none of which are relevant here, MLRPC Rule 5.4(a) provides that "[a] lawyer or law firm shall not share legal fees with a nonlawyer." Rule 7.2(c)—part of the rule dealing with advertising—provides that "[a] lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may pay the reasonable cost of advertising or written communication permitted by this Rule and may pay the usual charges of a not-for-profit lawyer referral service or other legal service organization."

As we indicated, the circuit court did not accompany its grant of summary judgment with either an oral or written explanation, and it therefore articulated no findings with respect to Rules 5.4(a) and 7.2(c). There is evidence in the record, however, when viewed in a light most favorable to Mr. Son, that would support a conclusion that either or both rules were violated.

A lawyer may, of course, if properly authorized, pay money otherwise due to the client from a judgment or settlement to a third person on the client's behalf. The settlement sheet in this case shows many such payments. What a lawyer may *not* do under Rule 5.4(a), unless one of the three exceptions applies, is share part of his or her own fee with a non-lawyer. The question, in that regard, is whether the $242,500 payment to Ms. Park falls within the first category or the second. There is evidence that the payment to Ms. Park was pursuant to an arrangement made between her and Ms. Son, that Mr. Stein had no part in it and, at least until November, 1992, was unaware of its details, that, at some point prior to the settlement, Mr. Son was made aware of the arrangement and agreed to it, that even if he was not aware of it, Ms. Son was aware of it and had authority to act on his behalf, and that the payment was therefore an authorized one made on behalf of the Sons. If the court were to make those findings, it could properly conclude that the payment did not constitute the

sharing of an attorney's fee and was therefore not in contravention of Rule 5.4(a).[6]

The record is also sufficient, however, to lead to a contrary conclusion. There is evidence that Mr. Stein was aware from the beginning that Ms. Park was to receive a percentage share of any judgment or settlement and that her share was to come from his fee. Ms. Park's deposition testimony, if credited, suffices to show that Stein was aware of her expectation of payment from the outset. The November, 1992 Consulting Agreement, which he signed, clearly reveals her interest in the litigation. A conclusion that her fee was to be part of his is supported by a number of facts. First, there are the four different retainer agreements, each reciting a different attorney's fee. Most relevant in this regard are the last two, signed just three weeks after the Consulting Agreement, one calling for a fee of 28.5% and the other showing a fee of 23.5%. That is not a normal arrangement between lawyer and client, and it may be more than mere coincidence that the difference between the two percentages equals the fee agreed to be paid to Ms. Park. A fair inference could be drawn that Mr. Stein was, in effect, agreeing to share part of his 28.5% fee with Ms. Park. That inference is supported by the further facts that (1) on both the settlement option analysis prepared by Mr. Stein in November, 1993, and on the actual settlement sheet signed on December 30, 1993, no deduction is shown for any payment to Ms. Park, (2) on both of those documents, Mr. Stein's fee is shown as 28.5%, and (3) the payments to Ms. Park and to the firm for its fee were made approximately two weeks after the settlement sheet was signed.[7] A trier of fact

---

**6.** Even if, in substance, the arrangement did not constitute an improper fee split, it was wholly inappropriate for Mr. Stein not to reveal the payment to Ms. Park on the settlement sheet.

**7.** The delay in these payments might be insignificant but for the fact that the record does not indicate whether *all* disbursements were delayed. A fair inference could be drawn, in the absence of contrary evidence, that the disbursements shown on the settlement sheet would be made within a day or so of the settlement; if that occurred and only

could well conclude that Stein's fee was 28.5%, as represented, and that the 5% payment to Ms. Park constituted a sharing of that fee. A trier of fact could also credit Mr. Son's statement that he was unaware, throughout, that Ms. Park was to receive a share of his recovery and that he, therefore, never authorized the payment to her.

Notwithstanding Mr. Son's alleged lack of knowledge, if the trier of fact were to conclude that Ms. Son properly acted as his agent and that, on his behalf and on her own behalf, had authorized the payment of a 5% fee to Ms. Park, it could on that basis, conclude that the payment was not in contravention of Rule 5.4(a). The problem, however, is that there is also sufficient evidence to create a legitimate dispute whether, by the time the consulting agreements and the rest of the written agreements were signed, and certainly by the time the settlement occurred, Ms. Son continued to act as her husband's agent and whether, in contrast, Mr. Stein, by then, was dealing directly with Mr. Son. Perhaps the most cogent evidence that any agency that formerly existed had ended was the fact that Mr. Stein had both Mr. Son and Ms. Son sign the settlement sheet. In his complaint, Mr. Son asserted that Stein had explained the new settlement analysis to *him*, not just to Ms. Son. If a trier of fact were to conclude that, by November, 1993, Mr. Stein was dealing directly with Mr. Son, as a principal, and no longer regarded Ms. Son as her husband's agent, he could conclude that (1) Stein had a duty to assure that Mr. Son understood and authorized the arrangement with Ms. Park and (2) Stein's failure to do so is evidence that the arrangement with Ms. Park did, indeed, constitute a fee-splitting agreement in contravention of Rule 5.4.

If a trier of fact were to conclude from the evidence that Mr. Stein indeed agreed to pay, and did pay, Ms. Park a part of his firm's fee, the trier of fact could also find that the payment was made "for recommending the lawyer's services," which would constitute a violation of Rule 7.2(c).

---

the attorney's fee and the payment to Ms. Park were delayed, the further inference could be drawn that the two payments were related.

In light of these conclusions, it will be necessary for the circuit court to conduct further proceedings and (1) make appropriate findings of fact from the disputed evidence, and (2) depending upon those findings, consider the factors mentioned in *Post v. Bregman, supra,* 349 Md. 142, 707 A.2d 806 (1998). It would seem, in this regard, that the focus should be on the $242,500 payment to Ms. Park, rather than on the $1,139,750 fee retained by the Margolius firm. Both Mr. and Ms. Son clearly assented to a fee in at least that amount, and there is nothing in the record to suggest that such a fee was not earned and was not appropriate. On this record, we can find no equitable basis for requiring the firm to disgorge that fee, even if the payment to Ms. Park were found to be in violation of Rule 5.4 or Rule 7.2. The issue is whether, if the payment to Ms. Park did constitute a violation of either Rule, Mr. Stein and the firm should be required to pay that amount to Mr. Son, on the ground that it should not have been deducted in the first instance.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMING JUDGMENT ON COUNT I REVERSED; CASE REMANDED WITH INSTRUCTIONS TO VACATE JUDGMENT OF CIRCUIT COURT ON THAT COUNT AND TO REMAND TO CIRCUIT COURT FOR FURTHER PROCEEDINGS (1) ON COUNT I IN ACCORDANCE WITH THIS OPINION AND (2) ON COUNTS II THROUGH V IN ACCORDANCE WITH OPINION OF COURT OF SPECIAL APPEALS; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.

CHASANOW, J., files concurring opinion in which CATHELL, J., joins.

CHASANOW, Judge, concurring.

I concur in the judgment that there are material facts in dispute and that the case needs to be remanded to the trial court, and I concur in the portion of the Court's opinion headed "Barratry." For reasons explained in my dissent in

*Post v. Bregman,* 349 Md. 142, 707 A.2d 806 (1998), however, I disagree with the application of the holding in *Post* to the instant case. The majority remands this case for the trial judge to determine if there is an ethical violation by the defendant law firm and, if so, to apply an equitable test and reduce the fee by 5% unless the ethical violation is " 'technical, incidental, or [in]substantial'." 349 Md. 461, 709 A.2d 122 (1998) (quoting *Post,* 349 Md. at 170, 707 A.2d at 819–20). There is no reason to reiterate my objections to the Court's vague, amorphous equitable weighing test to determine which ethical violations void fee contracts and which should be ignored. As I stated in *Post,* this Court should apply settled contract law to resolve fee contract disputes.

The issue is whether there was a valid fee agreement for a fee of 28.5% of any settlement, a valid agreement for a fee of 23.5% of any settlement, or a fraudulent misrepresentation that the agent agreed to a 28.5% fee when, in fact, Mr. Son's agent agreed to a 23.5% fee with a 5% concealed kickback. If the facts show the defendant law firm had a valid agreement with Mr. Son to represent him for a fee of 28.5% of the tort settlement, that agreement between Mr. Son and the law firm is not improper, and what the firm does with its validly earned fee is simply of no concern to Mr. Son. If the firm unethically used 5% of its earned fee to pay Ms. Park or unethically used some or even all of its fee to pay a bribe or illegal gambling debt, that should be between the firm and bar counsel and should not constitute a windfall to Mr. Son. If the facts show that Mr. Son agreed to a 23.5% fee and also made a voluntary assignment of 5% of any settlement recovery to Ms. Park, the law firm should honor that assignment without inquiry into Mr. Son's motives and the adequacy of the consideration for the assignment. On the other hand, if Mr. Son could prove that the law firm, assisted by Ms. Son and Ms. Park, defrauded Mr. Son by claiming the contract negotiated by Mr. Son's wife on his behalf was for a fee of 28.5% as shown in a fraudulent fee agreement when the actual fee charged was only 23.5% as shown in a secret agreement, the attempt to defraud Mr. Son of 5% of his recovery could render the fee

contract voidable. If the firm fraudulently exhibited to Mr. Son a false written fee agreement signed by his wife on Mr. Son's behalf for a fee of 28.5% and fraudulently concealed that part of the fee was really a 5% ($242,500) "kickback" to Ms. Park, such fraud as to the negotiated attorney's fee might justify Mr. Son's request to repudiate the fraudulent fee contract. While it may be quite difficult for Mr. Son to prove a fraudulently concealed kickback, if he does, this Court should not simply reform the agreement and reduce it by the fraudulent 5%, it should permit Mr. Son to repudiate the fraudulent contract and limit the attorney to *quantum meruit* recovery. The instant case is a contractual dispute. Traditional contract law should be applied. Neither court created "public policy," nor any vague "equitable" balancing should be substituted for established contractual principles.

The majority concludes that Mr. Son has no cause of action against Mr. Stein if Mr. Son agreed that 5% of any settlement recovery would go to Ms. Park, and it was to be payable *out of his share of the recovery.* I am in full agreement with this part of the Court's opinion. The majority then goes on to conclude that Mr. Son has a cause of action to apply the vague, amorphous equitable test devised in *Post* if the 5% paid to Ms. Park came out of Mr. Stein's share of the recovery. According to the majority, if Mr. Stein paid Ms. Park 5% from his fee instead of from Mr. Son's share of the recovery, then Mr. Son has a cause of action against his lawyer. This cause of action exists even if Mr. Son agreed to the 28.5% fee which the majority and I recognize is quite reasonable. This cause of action exists even if Mr. Son knew of and agreed that Ms. Park would get 5% of the attorney's fee or if the attorney paid Ms. Park out of his fee without saying anything to Mr. Son. The sole basis for this cause of action would be the lawyer's violation of the Maryland Lawyers' Rules of Professional Conduct (ethical rules).

What is most troubling about the majority opinion is that the Court has concluded that it should enforce ethical rules by flagrantly violating the same rules. The Court holds Mr. Son has a cause of action against Mr. Stein to recover back some

portion of the 28.5% fee, even if he agreed to that fee, if the evidence shows the lawyer violated ethical rules 5.4 or 7.2 by paying an improper referral to Ms. Park. The sole basis for Mr. Son to recover part of the fee he agreed to is an implied cause of action for the client against the lawyer based solely on the lawyer's violation of the ethical rules. In creating this cause of action, this Court violates another provision of the rules that is expressly directed to courts. The scope provision of the ethical rules expressly provides in pertinent part:

"Preamble: A lawyer's responsibilities.

### Scope

*Violation of a Rule should not give rise to a cause of action* nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability." (Emphasis added).

This Court does not encourage respect for the rules by using parts of the ethical rules to imply a cause of action that violates an express provision of the ethical rules. The decision in the instant case is a further unwarranted extension of *Post, supra.* In that case, the Court said a violation of the ethical rules could void a contract between two attorneys. In the instant case, the Court goes much further and, in clear violation of the express language of the ethical rules, this Court creates a new civil cause of action for the client to recover back a part of the fee earned by the attorney and agreed to by the client. If Mr. Son agreed to and paid a 28.5% fee and if there was no fraud by the lawyer, Mr. Son should have no right to recover back any part of that fee solely because the lawyer spent it in an unethical manner. Although this Court adopted the ethical rules, we are not free to disregard them at will, and even absent the express language of the ethical rules, we should avoid creating new civil causes of action for violations of Court directives.

Judge CATHELL has authorized me to state that he joins in the views expressed in this concurring opinion.