Affirmed by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge WILLIAMS joined.
Judge MICHAEL wrote a dissenting opinion.
OPINION
NIEMEYER, Circuit Judge.
The district court declined to enforce, as void against public policy, contracts and related assignments between Accrued Financial Services, Inc. (“AFS”) and its clients, who were tenants in outlet shopping malls. The contracts provided that AFS would conduct audits of the tenants’ leases with their landlords and retain 40-50% of any discrepancy that AFS would discover and collect for the tenant. As part of the arrangement, the tenant assigned to AFS exclusive control of all potential legal claims that the tenant might have against the landlord. The district court concluded that the contractual arrangements were “champertous” and that they violated Maryland’s public policy against private parties’ “contingent fee witness agreements.” For the reasons that follow, we affirm.
I
Accrued Financial Services, Inc. is a California corporation engaged in the business of conducting lease audits for tenants in commercial buildings and factory outlet malls. It is paid by retaining a percentage of the “discrepancies” that it discovers and collects as a result of its audits. As part of its arrangement with client-tenants, AFS requires that the tenant assign to AFS all legal claims that the tenant has against the landlord and give AFS control over any litigation that AFS might wish to initiate to enforce the claims.
The relationship is typically documented by a “Letter of Agreement Regarding Leased Locations” and an “Assignment of Cause of Action.” In the Letter of Agreement, the tenant authorizes AFS “to serve as sole and exclusive representative” of the tenant for the purpose of reviewing the lease relationship and appoints AFS “to contact, negotiate, and settle with Clients’ landlords” any overcharge discovered by AFS. The tenant also gives AFS authority to pursue collection of any overcharge, which the agreement refers to as a “Discrepancy,” using “its normal collection practices,” including authority “to file all lawsuits under AFS’s name as plaintiff’ and “full discretion [after consultation with the tenant] to accept or reject any settlement or other disposition.” Finally, under the Letter of Agreement, the tenant authorizes AFS to retain as its fee 40-50% of any “discrepancy” discovered and collected. If the tenant chooses not to pursue the discrepancy, the tenant must pay AFS *295 40% of the discrepancy “as a Cancellation fee for providing Client [tenant] with valuable information and services.”
The Assignment of Cause of Action, executed in connection with the Letter of Agreement, provides that the tenant assigns to AFS “any and all causes of action [tenant] may have” against its landlord “arising solely from periodic (including annual) charges of any type whatsoever made by or on behalf of the Landlord.” The Assignment provides that AFS “may adjust, compromise, or settle the assigned cause of action at its reasonable discretion.” AFS retains as a commission 40-50% of the net recovery, defined to be the total recovery less attorneys fees and litigation costs. The Assignment provides that it is “governed by and construed in accordance with the laws of California.”
Pursuant to a particular Letter of Agreement and Assignment, AFS conducted audits at two large factory outlet malls, one in Michigan, owned by Horizon Group, Inc., and the other in Baltimore, Maryland, owned by Prime Retail, Inc.[1] These audits purportedly led AFS to find more than mere “discrepancies.” AFS contends that it discovered that Prime Retail had made “improper charges and reserve assessments which could not be explained as mere errors or even aggressive billing practices. The errors were systematic and pervasive.” Rather than simply “contact[ing], negotiating], and settling]” the discrepancies, AFS persuaded 16 other tenants located in Prime Retail malls to enter into similar contractual relationships with AFS[2] and thereby launched a larger attack against Prime Retail.
In May 1998, on behalf of the 17 tenants, AFS sent Prime Retail a demand letter in connection with a broad array of claims that AFS asserted it had discovered and acquired through assignments. In response, Prime Retail filed an action in the Circuit Court for Queen Anne’s County, Maryland, seeking a declaratory judgment that AFS was not the proper plaintiff on the claims and therefore lacked standing to assert them. Shortly thereafter, AFS commenced an action in the Central District of California for the claims it discovered in Michigan and Maryland, alleging RICO violations (i.e., violations of the Racketeering Influenced and Corrupt Organizations Act), violations of the California Business and Profession Code, fraud, breach of express and implied lease covenants, and related claims involving malls across the country. The district court in California transferred the action to the District of Maryland, after which AFS voluntarily dismissed the case without prejudice.
AFS then commenced a second action in the Circuit Court for Baltimore City, Maryland, which Prime Retail removed to federal court. In that action, AFS, suing in its own name on behalf of 17 tenants at almost 50 locations, alleged nine different causes of action similar to those alleged in the first action. It asserted two additional counts on its own behalf, alleging tortious interference with AFS’s contractual relations and prospective advantage. Prime Retail filed a motion to dismiss under Fed *296 eral Rules of Civil Procedure 12(b)(6) and 17, as well as under 28 U.S.C. § 1367 (conferring supplemental jurisdiction). Among other things, Prime Retail contended that AFS lacked standing to bring the claims because the alleged assignments were invalid as against public policy.[3] With respect to the two claims brought on AFS’s own behalf — both under state law— Prime Retail urged the district court not to exercise supplemental jurisdiction.
The district court granted Prime Retail’s motion to dismiss because “the assignments made by the tenants to AFS [were] void as a matter of public policy because they [were] champertous.” The court also concluded that the assignments were void because they violated the public policy of both California and Maryland against “contingent fee witness agreements.” The court observed that “[financial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process whieh depends upon the truthfulness of the witnesses.” The court concluded that, without the assignments, AFS had no interest in the claims, and accordingly, it dismissed the first nine counts for AFS’ lack of standing. With respect to the two state-law counts asserted by AFS on its own behalf, the district court declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). From the district court’s judgment in this case, AFS filed one of the appeals before us.
After the district court dismissed this second suit, AFS commenced a third action in state court, identical to the second action, to protect itself against the running of the statute of limitations on the two state-law claims. This action was again removed to federal court, and the district court again dismissed the first nine counts, now relying on the doctrine of res judica-ta. With respect to the two state-law causes of action, however, the court stayed disposition pending appeal. The court then certified final judgment under Federal Rule of Civil Procedure 54(b). AFS also filed an appeal from this judgment.
The two appeals now before us are concurrent, raising the same issue — whether the contractual arrangements between AFS and the tenants are void as against the public policy of Maryland.
II
AFS’s standing to bring the claims at issue was created solely through the tenants’ assignments to AFS of all legal claims that AFS discovered through its audits. Without the assignments, AFS had no interest in the tenants’ claims. Moreover, AFS’s interest in the claims was not based on securing any underlying transaction or preexisting commercial relationship between the tenants and AFS or satisfying any preexisting obligation. In short, AFS’s interest in the litigation was solely to collect fees that its audits and litigation would generate.
AFS seeks to justify its contractual arrangements with the tenants under standard principles of assignment law, which recognize the legality of assigning both existing and potential choses in action, so long as the causes of action survive the death of the assignor. As AFS correctly asserts, those principles apply under both the law of Maryland and the law of California. Hernandez v. Suburban Hosp. Ass’n, Inc., 319 Md. 226, 572 A.2d 144, 148 (Md. 1990) (“ ‘[A] chose in action in tort is generally assignable, in the absence of a statu *297 tory prohibition, if it is a right which would survive the assignor and could be enforced by his personal representative'" (quoting Summers v. Freishtat, 274 Md. 404, 335 A.2d 89, 92 (Md.1975))); Curtis v. Kellogg & Andelson, 73 Cal.App.4th 492, 86 Cal. Rptr.2d 536, 545 (Cal.Ct.App.1999) (stating California's rule that choses in action arising "out of an obligation, breach of contract, violation of right of property, or damage to personal or real property" are assignable).
Because all of the claims asserted in this case were commercial claims that would survive the death of the assignor, there is no question that the choses in action were generally assignable. But that general principle, heavily relied upon by AFS, does not override the principle that an assignment, like any other contract, is enforceable only to the extent that it is consistent with public policy. See, e.g., Hernandez, 572 A.2d at 148 (considering whether there were any public policy reasons to preclude a particular assignment); see also McCabe v. Medex, 141 Md.App. 558, 786 A.2d 57, 62 (Md.Ct.Spec.App.2001) ("[A] contract conflicting with public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy.").
While the assignments in this case contain a choice-of-law provision providing that California law governs, the parties' choice of law provision is enforceable only to the extent that the chosen law does not violate a fundamental public policy of the forum state, Maryland. Am. Motorists Ins. Co. v. ARTRA Group, Inc., 338 Md. 560, 659 A.2d 1295, 1301 (Md.1995) (stating that a choice-of-law clause will not be honored if "the strong fundamental public policy of the forum state precludes the application of the choice-of-law provision"); see also Restatement (Second) of Conflict of Laws § 187(2)(b) (1971). We must therefore determine whether the Assignments in this case violate Maryland's public policy.
At the outset, we observe that the assignments of the choses in action in this case were not made for the traditional purposes of securing an existing transaction, collecting on a pre-existing debt, giving effect to a form of subrogation, or satisfying a preexisting obligation. Rather, they were sought by AFS to further its business of uncovering claims and earning fees from collecting on them.
In entering into the arrangements at issue, AFS held itself out to the tenants as an expert in conducting audits of commercial leases, and it proposed to search the tenant's files for claims of which the tenant had no knowledge. There is no suggestion that the tenants knew or suspected wrongdoing before AFS proposed to perform the audits. As far as the tenants were concerned, there could have been major claims, minor claims, or no claims at all. The Letter of Agreement stated, quite simply, that AFS would seek to discover discrepancies. But despite this initial focus on discrepancies, AFS relied on the Assignment of choses in action to give effect to its contingent fee business, which was implemented in a manner that served AFS's interest more than the legitimate interest of resolving discrepancies in a manner suitable to the tenant.
The Assignments encompassed "any and all causes of action," present and future, and the consideration for them was not fixed but rather dependent on what AFS could discover. If discrepancies were discovered, the corresponding claims would immediately become the property of AFS under its sole control. And if, after discovery of the claims, the tenant were to determine that it would not be in the tenant's best interest to pursue litigation, *298 there was no effective way to prevent AFS from prosecuting the claim in court. The cost to a tenant for refusing to cooperate or provide the information necessary for the litigation was the obligation to pay AFS the fee that it otherwise would have earned had it successfully prosecuted the litigation. Thus, the tenant was left with the Hobson’s Choice of allowing AFS to design and pursue a lawsuit on the tenant’s behalf or of paying AFS its contingency fee as if AFS had succeeded, regardless of the merits of the proposed claim.[4]
In short, the Assignments, which were purchased with contingent consideration, gave AFS effective control over discovery and design of lawsuits, of which the assign- or had no knowledge, without requiring, upon discovery, a renewed consent from the real party in interest before proceeding with litigation.
These relationships between AFS and the tenants were essentially lawsuit-mining arrangements under which AFS “mined for” and prosecuted lawsuits with no regard for the informed wishes of the real parties in interest. AFS thus became a promoter of litigation principally for the sake of the fees that it would earn for itself and not for the benefit that it might produce for the tenant, the real party in interest. Under these arrangements, even though the tenant might conclude, after reviewing the facts uncovered, that a lawsuit would imprudently damage the landlord-tenant relationship — or that pursuing aggressive allegations would do more harm than good — the tenant lost the right to control its destiny. Because we see these broad assignments as nothing more than arrangements through which to intermed-dle and stir up litigation for the purpose of making a profit, we conclude that they violate Maryland’s strong public policy against stirring up litigation and are therefore void and unenforceable in Maryland.
The Court of Appeals of Maryland has recognized that the early common law had, in varying degrees, prohibited barratry, maintenance, and champerty, declaring contracts that provide for such conduct to be void.[5] See Son v. Margolius, 349 Md. 441, 709 A.2d 112, 119-20 (Md.1998); accord 7 Williston on Contracts §§ 15.1, 15.4 (Richard A. Lord ed., 4th ed.1997). But over time, the early definitions proved too broad and interfered with emerging commercial conditions, the recognition of assignments in general, and the rise of attorney representation under contingent-fee contracts. See Son, 709 A.2d at 119-21; see generally Max Radin, Maintenance by Champerty, 24 Cal. L.Rev. 48 (1935-36). Accordingly, the defining nature of barra-try, maintenance and champerty changed over the years.
But despite the law’s metamorphosis, Maryland continues to reserve a policy against some of the originally prohibited conduct. For example, the Maryland Court of Appeals explained, in Son, that conduct once characterized as maintenance is now prohibited in Maryland under the *299 label of barratry. Son, 709 A.2d at 120-21. The Maryland court observed that the broad definition of maintenance given in Blackstone’s Commentaries did not survive in Maryland, id. at 120, but that a more narrow form was retained under bar-ratry, which remains against Maryland public policy. Thus, the common law has simply been redefined under a modern form of barratry to reflect the current public policy against “improperly, and for the purpose of stirring up litigation and strife, encouraging] others either to bring actions, or to make defenses which they have no right to make.” Id. (internal quotation marks and citation omitted); Schaferman v. O’Brien, 28 Md. 565, 574 (1868) (citation omitted); see also Wheeler v. Harrison, 94 Md. 147, 50 A. 523, 526 (Md.1901) (noting that the public policy is violated where “one officiously and without just cause intermeddles in and promotes the prosecution or defense of a suit in which he has no interest by assisting either party with money or otherwise”). In other words, the concepts of “officious meddling” and “personal gain” reflect the modern policy, described by Williston, against enforcing “schemes to promote litigation. for the benefit of the promoter rather than for the benefit of the litigant or the public.” 7 Williston on Contracts § 15:4.
Indeed, an aspect of the public policy developed under Maryland’s common law was codified as a Maryland criminal statute, outlawing “barratry,” as follows:
Without an existing relationship or interest in an issue[,] a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit.
Md.Code Ann., Bus. Occ. & Prof. Art., § 10 — 605(a)(1). The Court of Appeals has characterized this statutory offense as the “stirring up, meddling in, or maintaining litigation in which the person has no interest, for personal gain.” Son, 709 A.2d at 121. And the key elements to the statutory offense are “officious meddling” and “personal gain.” Id.
Thus, through surviving common law principles and statutory prohibition, the current fundamental public policy of Maryland prohibits schemes to stir up and promote litigation for the benefit of the promoter rather than for the benefit of the real party in interest. Any contract violating this policy is void in Maryland and will not be enforced by its courts.
Considering the contractual arrangements before us, it is apparent that they violate Maryland’s strong public policy. These Assignments are not typical assignments of choses in action, which further existing or underlying commercial transactions. They are, rather, “schemes to promote litigation for the benefit of [AFS] rather than for the benefit of the litigant or the public.” As we explained above, the tenants, who were the real parties in interest, assigned rights in litigation of which they had no knowledge. Moreover, these rights were assigned, not in exchange for an existing value, but for future fees to be determined by decisions and value judgments controlled by AFS, who had no interest in the underlying claims. Because the rights were assigned before their nature, costs and benefits could be assessed, the real parties in interest — the tenants— had no opportunity to evaluate whether their prosecution was in the tenants’ interest. As such, AFS was given the power to mine lawsuits, promote them, and profit off of them without regard to the interests and desires of the injured party.
The essence of the contractual relationship between AFS and the tenants leaves AFS as a solicitor, for personal gain, of unknown litigation, in the business of stirring up litigation for the sake of its fees. If its real purpose was to provide consult *300 ing services within its expertise, as it insists, it can continue that business without the assignments. By concluding that the assignments in this case are against fundamental public policy, we in no way undermine or devalue any claims that AFS has discovered and that the tenants may have. If those claims are viable, the tenants retain the right to prosecute them with the assistance of AFS. Our holding focuses only on the promotional efforts of AFS in stirring- up litigation primarily at its own initiative and for its own benefit.
We thus agree with the district court that, whether under the label of maintenance, champerty or barratry, the Assignments in this case violate Maryland’s strong public policy against the stirring up litigation or promoting litigation for the benefit of the promoter rather than for the benefit of the litigant or the public.
Ill
In addition to our conclusion that the Assignments violate Maryland’s public policy against barratry, we also conclude that the arrangements are against public policy insofar as they provide for supplying expert testimony for a contingent fee. To the extent that AFS employees, as experts on the relationship between landlords and tenants in a commercial context, planned to testify regarding the allegations in this litigation, AFS was offering expert testimony for a contingent fee. Such an arrangement would also violate public policy, as articulated more fully by the district court.
Because of our rulings, we need not reach the other issues raised by AFS on appeal. The judgment of the district court is

AFFIRMED.

. Prime Retail has now acquired Horizon and therefore we refer to the two collectively as "Prime Retail.”

. One of the tenants did not sign a Letter of Agreement and Assignment but rather signed a similar document entitled "Consultant Agreement.” Under the Consultant Agreement, AFS was to retain a fee of 50% of all “net recoveries,” defined as the amount the tenant or AFS "actually received” from the landlord. The Consultant Agreement gave the tenant the right to disapprove any claims prepared by AFS and did not contain an assignment clause.

. Prime Retail also asserted that AFS did not adequately allege causes of action under RICO; that punitive damage claims could not be assigned to AFS by the tenants; and that the facts alleged did not amount to a claim under California’s unfair competition statute.

. In contrast to this arrangement where AFS had total control over prosecuting its discoveries, the Consultant Agreement, signed by one tenant, gives the tenant the opportunity to review AFS' discoveries and to disapprove claims proposed by AFS.

. Blackstone defined "common barratry ” as the offense of "frequently exciting and stirring up suits and quarrels”; "maintenance” as "an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it”; and "champerty " as a "bargain with a plaintiff or defendant ... to divide the land or other matter sued for between them ... whereupon the champertor is to cariy on the party's suit at his own expense.” 4 William Blackstone, Commentaries *134-36.