*Government Employees Insurance Company, et al. v. MAO-MSO Recovery II, LLC, Series PMPI, et al.*, Misc. Nos. 3 & 4, September Term, 2024. Opinion by Biran, J.

**MD. CODE ANN., BUS. OCC. & PROF. ("BO&P") § 10-604(b)(1) (1989, 2018 Repl. Vol.) – STATUTORY OFFENSE OF BARRATRY – ASSIGNMENT OF RIGHT TO SEEK AND RECEIVE UNPAID REIMBURSEMENT OF MEDICARE PAYMENTS –** The Supreme Court of Maryland held that Plaintiffs did not violate Maryland's barratry statute by soliciting Medicare secondary payers to assign to Plaintiffs the secondary payers' claims to seek reimbursement of Medicare payments. The barratry statute provides: "Without an existing relationship or interest in an issue … a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit[.]" BO&P § 10-604(b)(1). The statute does not prohibit all litigation-related solicitations for personal gain. With respect to a solicitation to file a lawsuit, the statute only reaches a solicitation of "another person[.]" Here, Plaintiffs did not solicit any secondary payer to file a lawsuit. Rather, Plaintiffs obtained the right to bring suit against primary payers in Plaintiffs' own names by obtaining assignments of secondary payers' claims.

**COMMON LAW – MAINTENANCE, CHAMPERTY, AND BARRATRY – ASSIGNMENT OF RIGHT TO SEEK AND RECEIVE UNPAID REIMBURSEMENT OF MEDICARE PAYMENTS –** The Supreme Court of Maryland held that, to the extent the common law doctrines of maintenance, champerty, and barratry continue to reach conduct that is not covered under BO&P § 10-604(b)(1), Plaintiffs' assignments do not violate those doctrines.

United States District Court for the District of Maryland
Case Nos.: TDC-17-0711 and TDC-17-0964
Argued: December 9, 2024

IN THE SUPREME COURT

OF MARYLAND

Misc. Nos. 3 & 4

September Term, 2024

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, ET AL.

v.

MAO-MSO RECOVERY II, LLC, SERIES
PMPI, ET AL.

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

Opinion by Biran, J.

Filed: July 11, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This Court may answer questions of law certified by a federal court "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 12-603 (1974, 2020 Repl. Vol., 2024 Supp.).

In two related cases, the United States District Court for the District of Maryland certified the following three questions to this Court:

1.  Whether it is the current fundamental public policy of Maryland to prohibit schemes to stir up and promote litigation for the benefit of the promoter rather than for the benefit of the real party in interest;

2.  If there is such a public policy, what are the specific terms of such a public policy; and

3.  If there is such a public policy, whether it is sufficiently strong that any agreement that violates it cannot be enforced by courts in Maryland, regardless of any choice-of-law provision contained in the agreement.

This Court reformulated the questions as:

> Whether the assignment of the right to seek and receive unpaid reimbursement of payments for expenses under 42 U.S.C. § 1395y(b)(3)(A) (2018) pursuant to a contingency compensation arrangement/agreement is void as against public policy of Maryland, and if so, whether such an arrangement/agreement is unenforceable regardless of any choice of law provision contained in such an agreement.

With respect to the first part of the reformulated question, we conclude that the assignments at issue in this case are not void as against public policy. That being the case, we do not reach the second part of the question.

# I

## Background

"The court certifying a question of law" to this Court "shall issue a certification order." CJP § 12-605(a). The order must contain "[t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose[.]" *Id.* § 12-606(a)(2). Under these statutory mandates, this Court accepts the facts provided by the certifying court. *United Bank v. Buckingham*, 472 Md. 407, 412-13 (2021); *see also Piselli v. 75th St. Med.,* 371 Md. 188, 202 (2002) ("[U]nder the Certification statute, the answering court is bound by the facts as agreed by the parties or stated in the Certification Order."). We now recite the facts provided by the certifying court verbatim, omitting only the court's citations to the federal court record:[1]

    a.  Plaintiffs have filed putative class action lawsuits, Case Nos. TDC-17-0711 and TDC-17-0964, in the United States District Court for the District of Maryland seeking relief under the Medicare Secondary Payer ("MSP") provisions, codified at 42 U.S.C. § 1395y, and related regulations.

    b.  Pursuant to the MSP provisions, Medicare, which is a federal health insurance program for qualified individuals who are age 65 or older and for persons with certain disabilities, *see* 42 U.S.C. §§ 1395-1395*lll*, is a secondary payer of medical expenses whenever a beneficiary has coverage from an insurer other than Medicare. *See id.* § 1395y(b)(2)(A).

    c.  In such instances of dual coverage, the non-Medicare insurer acts as the primary payer, and only if the cost of care exceeds the payment available

---

[1] In their briefs, the parties have made many factual assertions that go beyond the facts provided by the district court in its certification orders. Many of those assertions are disputed by the opposing party. In addition, the parties' factual assertions are immaterial to the resolution of the legal questions the certifying court has asked this Court to answer. For these reasons, we consider only the facts contained in the certification orders.

under the primary policy may Medicare then pay "for the remainder of [the] charge," subject to certain limitations. *Id.* § 1395y(b)(4).

d. Under certain circumstances in which the primary payer "has not made or cannot reasonably be expected to make payment ... promptly," Medicare may make a conditional payment; however, that payment is subject to reimbursement from the primary payer "if it is demonstrated that [the] primary plan has or had a responsibility to make payment with respect to such item or service." *Id.* § 1395y(b)(2)(B).

e. Under Part C of the Medicare program, private insurance companies and other entities contract with Medicare to provide private insurance plan options for Medicare beneficiaries, 42 U.S.C. §§ 1395w-21–1395w-29, and like Medicare, those companies, which are known as Medicare Advantage Organizations, are considered secondary payers and may, at their discretion, charge primary payers under circumstances in which Medicare would be permitted to do so. *See id.* § 1395w-22(a)(4).

f. Plaintiffs in both class action lawsuits (collectively, "Plaintiffs") are limited liability companies that were established for the purpose of engaging in a business enterprise under which they seek to recover, through litigation or otherwise, unpaid reimbursements for their clients, which consist of Medicare Advantage Organizations and other contractors that are secondary payers.

g. As a method of recovering any such funds, Plaintiffs effectuated "Claims Cost Recovery Agreements," under which their secondary-payer clients ("Assignors") assigned to Plaintiffs their rights to seek and receive reimbursement from the primary payers and granted to Plaintiffs control over any litigation conducted.

h. Plaintiffs had no preexisting interest in the claims. Rather, all of their claims are derivative of the Assignors' alleged rights.

i. With some exceptions, these agreements include identical or substantially similar provisions establishing a contingent compensation arrangement under which the client receives a percentage of any recovery obtained from claims pursued by Plaintiffs, and Plaintiffs keep the remainder of the proceeds.

j. Assignors were either not aware that they had claims or did not know how many claims that they had at the time that they entered into the assignments.

3

k. None of Plaintiffs' assignments assign claims against a specifically identified party.

l. None of Plaintiffs' assignments have choice-of-law provisions that state that those contracts are governed by Maryland law; rather, the assignments in many instances state that they are governed by the law of states other than Maryland.

m. In the actions before the Court, Plaintiffs claim that their clients made conditional payments for medical services that should have been paid by Defendants in both cases (collectively, "Defendants") in the first instance.

n. On January 22, 2024, Defendants filed a Combined Dispositive Motion in which they argued, in relevant part, that Plaintiffs' assignments are void as against Maryland public policy based on *Accrued Financial Services, Inc. v. Prime Retail, Inc.*, 298 F.3d 291 (4th Cir. 2002), in which the court voided the assignments at issue based on a strong Maryland public policy relating to champerty or barratry, described as "Maryland's strong public policy against the stirring up [of] litigation or promoting litigation for the benefit of the promoter rather than for the benefit of the litigant or the public." *Id.* at 300.

o. Plaintiffs, in turn, challenge this reliance and cite to the dissent in *Accrued*, in which the dissenting opinion disputed that such a public policy currently exists in Maryland, let alone one sufficiently strong to displace the application of contrary state law pursuant to a choice-of-law provision. *Id.* at 302-05 (Michael, J., dissenting).

p. On June 10, 2024, the Court denied Defendants' Motion as to all other dispositive issues and, finding no clear and definitive statement of Maryland law from a Maryland appellate decision, constitutional provision, or statute on whether Maryland has a public policy against champerty or barratry, the contours of any such policy, or its relation to contractual choice-of-law provisions, denied without prejudice the public policy argument so that it could certify questions of law to the Maryland Supreme Court.

4

## II

## Standard of Review

"In responding to a certification from another court, this Court resolves only issues of Maryland law, not questions of fact." *Doe v. Cath. Relief Servs.*, 484 Md. 640, 651 (2023) (quoting *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 482 Md. 223, 238 (2022)). In addition, we "may go no further than the question certified." *Id.* Because we are deciding questions of law and not reviewing a lower court ruling, our analysis necessarily is *de novo*. *Id.* (citing *Dickson v. United States*, 478 Md. 255, 260 (2022)).

## III

## Discussion

Defendants, Government Employees Insurance Company and its affiliates ("GEICO"), argue that we should answer both parts of the reformulated certified question in the affirmative. According to GEICO, Maryland has a narrow, but fundamental, modern public policy against schemes to promote litigation for the benefit of the promoter rather than the benefit of the real party in interest. GEICO contends that this policy derives from the common law doctrines of maintenance, champerty, and barratry, as well as from Maryland's misdemeanor criminal statute entitled "barratry," which prohibits certain types of solicitation relating to litigation. Md. Code Ann., Bus. Occ. & Prof. ("BO&P") § 10-604(b)(1) (1989, 2018 Repl. Vol.). GEICO claims that this fundamental policy renders Plaintiffs' assignments unenforceable regardless of any choice-of-law provision.

Plaintiffs contend that their assignments are not void as against Maryland public policy. They argue that BO&P § 10-604(b)(1) does not bar the assignment of claims.

Further, they assert that the common law doctrines of maintenance, champerty, and barratry have been obsolete for centuries, and that this Court should not resurrect them now. Instead, Plaintiffs ask us to "explicitly retire[]" these "archaic" doctrines. Plaintiffs also argue that their assignments are enforceable even if there is a policy in Maryland against such assignments, due to the assignments' choice-of-law provisions.

We conclude that Plaintiffs' assignments are not void as against public policy. The assignments do not violate BO&P § 10-604(b)(1); therefore, they do not violate the policy furthered by that statute. In addition, to the extent the Maryland common law prohibitions against maintenance, champerty, and barratry continue to reach conduct that is not covered under BO&P § 10-604(b)(1), Plaintiffs' assignments do not violate those doctrines.

## A. Maintenance, Champerty, and Barratry

### 1. Historical Development

The common law doctrines of maintenance, champerty, and barratry were designed to prohibit "the officious stirring up of … litigation in which a person had no interest[.]" *Son v. Margolius, Mallios, Davis, Rider & Tomar*, 349 Md. 441, 457 (1998). Although these doctrines have been defined in various ways, put simply: "maintenance" was helping another prosecute or defend a suit; "champerty" was maintaining a suit in exchange for a financial interest in the outcome; and "barratry" was the continuing practice of maintenance or champerty. *In re Primus*, 436 U.S. 412, 424 & n.15 (1978).

Legal historians have traced the roots of these doctrines back to ancient Greece, where only judges and litigants were expected to participate in legal proceedings. *See* Max

Radin, *Maintenance by Champerty*, 24 CALIF. L. REV. 48, 48 (1935) ("Radin").[2] In medieval England, the prohibition against "maintenance" emerged from fears that those with means, particularly the noble class, could exploit the legal system to consolidate power and harass their adversaries through frivolous or abusive litigation. *See id.* at 64 (describing maintenance as "one of the means by which powerful men aggrandized their estates and the background was unquestionably that of private war"); W.S. Holdsworth, *The History of the Treatment of Choses in Action by the Common Law*, 33 HARV. L. REV. 997, 1007 (1920) (noting that corruption and the complexity and cost of legal proceedings made maintenance and similar offenses a serious problem, requiring strict prohibition); *Sedgwick v. Stanton*, 14 N.Y. 289, 296-97 (1856) (explaining that maintenance laws arose due to "a class of nobles, who, by their great power and influence, could overawe the courts and pervert the course of justice").[3]

English statutes and common law doctrines addressing these concerns evolved over the centuries. By Blackstone's time in the eighteenth century, "common barratry" was "the offence of frequently exciting and stirring up suits and quarrels between his majesty's

---

[2] As skilled writers and speakers became more common in ancient Greece, courts began permitting advocates to assist litigants. However, litigants were still required to deliver the formal speech required by the Athenian court themselves, and it was considered a serious fraud if the court discovered that an advocate had been hired rather than acting as a professed friend or relative of a litigant. *See* Radin at 50.

[3] To illustrate these concepts, imagine that a feudal lord funds a lawsuit between two poor farmers over a land dispute, despite having no personal stake in the case (maintenance). In exchange, the lord secures half of any land recovered (champerty). To further his interests, he also repeatedly encourages villagers to file baseless lawsuits against his rivals (barratry).

subjects[.]" 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 133 (Oxford Univ. Press ed. 2016) ("BLACKSTONE"). The offense of maintenance bore "a near relation" to barratry, "being an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it[.]" *Id.* at 134. Champerty was "a species of maintenance" that "signifie[d] the purchasing of a suit, or right of suing: a practice so much abhorred by our law, that it is one main reason why a *chose* in action … is not assignable at common law; because no man should purchase any pretence to sue in another's right." *Id.* at 134-35.

2. Evolution of Maintenance, Champerty, and Barratry in Maryland

The framers of our State Constitution adopted the common law of England as it existed on July 4, 1776 as part of the law of Maryland. MD. CONST. DECLARATION OF RIGHTS art. 5(a)(1). Thus, the English common law offenses of maintenance, champerty, and barratry became part of Maryland's common law. *See Son*, 349 Md. at 457 (explaining that, before Maryland first made barratry a statutory offense in 1908, "the officious stirring up of, maintaining, or meddling in litigation in which a person had no interest constituted the common law crime of barratry, maintenance, champerty, or embracery,[4] depending on the particular nature of the conduct").

In *Son*, this Court recounted the history of these doctrines in Maryland. Son, a Korean immigrant with limited English proficiency, was seriously injured in a car accident. *Son*, 349 Md. at 447. Son's spouse entered into a fee-based arrangement with a consultant

---

[4] Embracery was "an attempt to influence a jury corruptly to one side by promises, persuasions, entreaties, money, entertainments, and the like." BLACKSTONE at 140.

to the Korean community, who agreed to help find an attorney to pursue a personal injury case on behalf of Son. *Id.* at 447-49. Son later challenged the law firm's payment to the consultant out of the proceeds of the settlement of his case. *Id.* at 443-44.

Among other contentions, Son claimed that the consultant and the law firm had violated Maryland's barratry statute. With respect to the consultant, the statute made it a misdemeanor for a person, "[w]ithout an existing relationship or interest in an issue …, for personal gain, [to] solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit[.]" *Id.* at 444, 456-57 (quoting BO&P § 10-604(a)(1) (1995 Repl. Vol.)).[5] The statute also made it a misdemeanor for a lawyer to engage in certain litigation-related conduct. Similar to the prohibition that applied to non-lawyers in section 10-604(a)(1), the statute provided: "Without an existing relationship or interest in an issue[,] … a lawyer, except as provided in the Rules of Professional Conduct, may not … for personal gain, solicit another person to sue or to retain the lawyer to represent the person in a lawsuit[.]" *Id.* at 456-57 (quoting BO&P § 10-604(a)(2)(i)). The circuit court granted summary judgment for the consultant and the law firm, *see id.* at 444, and Son appealed.

In examining the common law roots of the barratry statute, this Court explained that the "broad scope of common law maintenance … did not survive beyond the mid-Nineteenth Century" and that maintenance instead had been confined to cases where a person "improperly, and for the purpose of stirring up litigation and strife, encourage[d]

---

[5] The General Assembly amended the barratry statute in 2008. The provision that was contained in section 10-604(a)(1) when the Court decided *Son* was recodified as section 10-604(b)(1) with no changes to its language.

others either to bring actions, or to make defences which they have no right to make." *Id.* at 458 (quoting *Findon v. Parker*, 11 M. & W. 679, 682 (1843)).[6] The Court further observed that this narrowing of maintenance effectively aligned it with Blackstone's definition of barratry. *See id.* at 458-59. We noted that this definition had been "favorably quoted by our predecessors[.]" *Id.* (citing *Schaferman v. O'Brien*, 28 Md. 565, 574 (1868)).[7]

We then analyzed the barratry statute, which was originally enacted in 1908. We explained that, compared to the common law doctrine of barratry as it existed in Maryland by the middle of the nineteenth century, the barratry statute "is somewhat more specific in its articulation." *Id.* at 459. The "essence of barratry under the statute 'is the *solicitation* of

---

[6] *See also Sedgwick v. Stanton*, 14 N.Y. 289, 297 (1856) (observing that, in the United States, "where no aristocracy, nor any privileged class, elevated above the mass of the people, has ever existed, there would seem never to have been any good reason for the prevalence of [the law of maintenance]").

[7] In *Schaferman v. O'Brien*, this Court also recognized that champerty – "[t]he ancient policy which prohibited the sale of pretended titles, as an act of maintenance" – was "founded upon a state of society which does not exist in this country." 28 Md. 565, 573 (1868) (internal quotation marks and citation omitted). The Court opined that the Maryland statute prohibiting champerty, which dated back to the time of Henry VIII, was largely obsolete:

> We are not aware of any case in the judicial history of this State, where the provisions of the statute of Henry VIII, have been enforced – without meaning to assert that there might not be such exceptionable conduct savoring of champerty and maintenance, as to be punishable, yet there can be no doubt that this statute is, in a great measure, now obsolete.

*Id.* at 574. The General Assembly recognized in 1974 that the champerty statute was not in force in the State. *See* Md. Code Ann., Real Prop. ("RP") § 14-115 (1974, 2023 Repl. Vol.).

another to make a litigious claim….'" *Id.* (quoting *Schackow v. Med.-Legal Consulting Serv., Inc.*, 46 Md. App. 179, 193-94 (1980)).

We noted that the consultant in Son's case had not approached Son's wife; rather, it was Son's wife who had asked the consultant to assist her in finding an attorney. *See id.* Rejecting Son's argument that the consultant engaged in "constructive solicitation" by holding herself out as someone in the community who, for a fee, regularly assisted Korean people in finding attorneys, we explained that Son "miss[ed] the point of the statute and, to the extent relevant, the antecedent common law." *Id.* We explained that "[t]he thrust of the offense is stirring up, meddling in, or maintaining litigation in which the person has no interest, for personal gain. The officious meddling and the personal gain are separate elements, and both must be satisfied." *Id.* at 459-60. Because there was no evidence that the consultant "engaged in any proscribed meddling," and because there was also no evidence that anyone at the law firm had engaged in any solicitation or committed any other prohibited act, we held that there was no violation of the barratry statute. *Id.* at 460.[8]

---

[8] However, that was not the end of our inquiry in *Son*. We also analyzed whether the arrangement between the law firm and the consultant constituted a violation of Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 5.4(a) or 7.2(c), "and was, for that reason void as against public policy." 349 Md. at 461. MLRPC 5.4(a) provided that "[a] lawyer or law firm may not share legal fees with a nonlawyer." MLRPC 7.2(c) provided that "[a] lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may pay the reasonable cost of advertising or written communication permitted by this Rule and may pay the usual charges of a not-for-profit referral service or other legal service organization." *Id.* at 462. We concluded there was evidence in the record that, when viewed in the light most favorable to Son, would support the conclusion that the law firm and/or its members violated one or both of these ethics rules. *See id.* at 462-64. Accordingly, we ordered a remand to the circuit court for additional factfinding. *Id.* at 465.

### 3. Status of Maintenance-Related Doctrines in Other Jurisdictions

Today, the status of the maintenance-related doctrines varies significantly across the country. Some states still retain them. *See, e.g.*, *Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217, 220 (Ohio 2003) (noting that, although the doctrines of champerty and maintenance have "lain dormant in Ohio courts" in recent years, they remain part of Ohio's common law as contract defenses); *Toste Farm Corp. v. Hadbury, Inc.*, 798 A.2d 901, 906 (R.I. 2002) (holding that maintenance remains a cause of action because prior decisions have never been "overruled, doubted or denied") (internal quotation marks and citations omitted). Some states never adopted the doctrines at all as to criminal and/or civil actions. *See, e.g.*, *Martin v. Freeman*, 31 Cal. Rptr. 217, 218 (Cal. Dist. Ct. App. 1963) (maintenance and champerty never adopted in California); *Bentinck v. Franklin*, 38 Tex. 458, 472-73 (1873) (same in Texas); *Rice v. Farrell*, 28 A.2d 7, 8 (Conn. 1942) (doctrines of champerty and maintenance as applied to civil actions never adopted in Connecticut).

Other states have significantly narrowed their application. *See McMullin v. Borgers*, 806 S.W.2d 724, 735 (Mo. Ct. App. 1991) ("Champerty is not a defense which is available to a third party."); *Odell v. Legal Bucks, LLC*, 665 S.E.2d 767, 774-75 (N.C. Ct. App. 2008) (holding that an assignment is not champertous unless the assignee gains control over the lawsuit, not just the proceeds, and unless the assignment has as its purpose, and not just as an effect, the stirring up of litigation).

Finally, in what may be a modern trend, some states have abolished the vestiges of the doctrines altogether. *See Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235, 238 (Minn. 2020) ("Our review of changes in the legal profession and in society

convinces us that the ancient prohibition against champerty is no longer necessary."); *Osprey, Inc. v. Cabana, L.P.*, 532 S.E.2d 269, 279 (S.C. 2000) ("We abolish champerty as a defense because we believe it no longer is required to prevent the evils traditionally associated with the doctrine as it developed in medieval times."); *Saladini v. Righellis*, 687 N.E.2d 1224, 1226-27 (Mass. 1997) ("We also no longer are persuaded that the champerty doctrine is needed to protect against the evils once feared: speculation in lawsuits, the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining position. There are now other devices that more effectively accomplish these ends.").

### B. *Accrued Financial Services v. Prime Retail, Inc.*

In its certification order, the district court referenced the parties' differing positions concerning the Fourth Circuit's decision in *Accrued Financial Services, Inc. v. Prime Retail, Inc.*, 298 F.3d 291 (4th Cir. 2002).

In *Accrued*, the plaintiff ("Accrued") entered into agreements with commercial tenants in outlet shopping malls to review their leases for discrepancies between costs charged by their landlords and those permitted by their leases. *Id.* at 294-95. Under those agreements, the tenants assigned any potential legal claims to Accrued, authorizing it to "contact, negotiate, and settle" with the landlords, file lawsuits if necessary to recover overcharges, and retain 40 to 50 percent of any recovery. *Id.* The Fourth Circuit concluded that the assignments violated "Maryland's strong public policy against stirring up litigation" and were therefore void and unenforceable. *Id.* at 298. Thus, the court affirmed the trial court's dismissal of Accrued's lawsuits against the assignors' landlords. *See id.* at 294, 296.

13

The *Accrued* Court relied on this Court's decision in *Son*, which, as discussed above, analyzed the evolution of the common law doctrines of maintenance, champerty, and barratry in Maryland. *Id.* at 298-99. The *Accrued* Court distilled from *Son* that Blackstone's "broad definition of maintenance … did not survive in Maryland," but that "a more narrow form was retained under barratry, which remains against Maryland public policy." *Id.* at 299. Thus, the court reasoned, "the common law has simply been redefined under a modern form of barratry to reflect the current public policy against improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring actions, or to make defenses which they have no right to make." *Id.* (citation modified). The Fourth Circuit observed that "an aspect of the public policy developed under Maryland's common law was codified" in Maryland's criminal barratry statute. *Id.* According to the *Accrued* Court, through the "surviving common law principles" discussed in *Son* and the statutory prohibition against barratry, "the current fundamental public policy of Maryland prohibits schemes to stir up and promote litigation for the benefit of the promoter rather than for the benefit of the real party in interest." *Id.*

The court held that the assignments by the tenants to Accrued violated this "strong public policy" and therefore were void and unenforceable. Unlike "typical assignments of choses in action, which further existing or underlying commercial transactions[,]" the assignments at issue in *Accrued* were "schemes to promote litigation for the benefit of [Accrued] rather than for the benefit of the litigant or the public." *Id.* (internal quotation marks omitted). In reaching this conclusion, the court emphasized several features of the transactions between Accrued and the assigning tenants. First, Accrued had no preexisting

14

connection to the claims it pursued. Second, the assignors were unaware of potential claims until Accrued conducted audits. Third, Accrued exercised exclusive control over recovery decisions, including whether and how to pursue litigation, without regard to the tenants' informed wishes. Finally, Accrued's compensation depended entirely on identifying and successfully pursuing claims. *Id.* at 297-98, 299.[9]

In dissent, Judge Michael observed that "Maryland's common law on maintenance, champerty, and barratry appears to be tending toward obsolescence because, as far as I can tell, Maryland has not used these common law doctrines to invalidate any contract in the last one hundred years." *Id.* at 303 (Michael, J., dissenting).

## C. Plaintiffs' Assignments Are Not Void as Against Maryland Public Policy.

We agree with Plaintiffs that their assignments are not void as against Maryland public policy. First, in securing the assignments, Plaintiffs did not violate the barratry statute, BO&P § 10-604(b)(1); therefore, the assignments do not violate the policy furthered by that statute. Second, to the extent the doctrines of maintenance, champerty, and barratry continue to reach conduct that is not covered under BO&P § 10-604(b)(1), Plaintiffs' assignments do not violate those doctrines.

---

[9] The court also observed that, while the agreements contained a California choice-of-law provision, that provision was enforceable only if the assignments did not violate "a fundamental public policy" of Maryland. *Id.* at 297. The court did not explain why the public policy it identified was "fundamental."

15

1.  Plaintiffs Did Not Violate Maryland's Barratry Statute.

GEICO contends that Plaintiffs' assignments are void as against public policy because they run afoul of Maryland's barratry statute. We disagree.

As pertinent here, the barratry statute provides: "Without an existing relationship or interest in an issue … a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit[.]" BO&P § 10-604(b)(1). The statute does not prohibit all litigation-related solicitations for personal gain. With respect to a solicitation to file a lawsuit, the statute only reaches a solicitation of "another person[.]" Here, Plaintiffs did not solicit any Medicare Advantage Organizations or other secondary payers to sue GEICO. Rather, Plaintiffs obtained the right to bring suit against GEICO in Plaintiffs' own names by obtaining assignments of secondary payers' claims. Given the plain language of BO&P § 10-604(b)(1), we conclude that Plaintiffs did not violate the barratry statute by obtaining those assignments. Accordingly, the assignments cannot be void as against any public policy furthered by Maryland's barratry statute.[10]

2.  Plaintiffs' Assignments Do Not Violate Maryland Common Law.

As discussed above, at common law, the doctrine of champerty prohibited the assignment or other purchase of a chose in action. However, in 1868, this Court commented that it was unaware of any case in the history of Maryland that had enforced the provisions of the statute of 32 Henry VIII, ch. 9, the medieval law that prohibited champerty.

---

[10] Plaintiffs assert that "the blanket anti-solicitation provisions in BO&P § 10-604(b)(3)" are "fraught with First Amendment issues." We need not address whether the barratry statute would be susceptible to a constitutional challenge by someone charged with violating it.

*Schaferman*, 28 Md. at 574.[11] Our predecessors recognized that the common law doctrines of maintenance and champerty were rooted in a "state of society" that did not exist in Maryland and were incompatible with the increasing acceptance of assignable claims (or "choses in action"). *See id.* at 573-74.

These observations resonate only more strongly today. Apart from the Fourth Circuit's decision in *Accrued*, we are unaware of any case in which a cause of action has been sustained, or a contract voided, based on Maryland common law related to maintenance or champerty. Indeed, as noted above, the General Assembly expressly clarified in 1974 that the statute of 32 Henry VIII, ch. 9, was not in force in Maryland. *See* RP § 14-115. As this Court has said before, "[w]hen an offense has lain virtually dormant for over two hundred years, it is difficult to argue that the preservation of society and the maintenance of law and order demand recognition of it." *Pope v. State*, 284 Md. 309, 343 (1979).

To the extent the *Accrued* Court read *Son* to support the proposition that "surviving common law principles" concerning maintenance, champerty, and barratry undergird a public policy that invalidates assignments similar to those at issue here, we disagree. While

_____

[11] Although the Court in *Schaferman* noted that William Kilty (who was commissioned by the General Assembly to determine which English statutes had applied in Maryland's colonial days) observed that the statute of 32 Henry VIII, ch. 9, had been "in force in this State," Kilty identified only a single prosecution under the statute. That was a 1713 prosecution for "bracery" – the crime of purchasing a land title from someone who had not possessed the land for at least a year before the sale. *See* WILLIAM KILTY, A REPORT OF ALL SUCH ENGLISH STATUTES AS EXISTED AT THE TIME OF THE FIRST EMIGRATION OF THE PEOPLE OF MARYLAND, AND WHICH BY EXPERIENCE HAVE BEEN FOUND APPLICABLE TO THEIR LOCAL AND OTHER CIRCUMSTANCES 232 (1811). The defendant was acquitted. *Id.*

the Court in *Son* recognized that the "officious meddling" that characterized "the antecedent common law" is an element of the barratry statute, 349 Md. at 459, we do not read *Son* as calling into question the practice of soliciting holders of claims for assignments of such claims, where the person doing the solicitation hopes to profit from the assignment. The Court in *Son* was skeptical that broad conceptions of maintenance and champerty "survive[d] beyond the mid-Nineteenth Century" and suggested that these doctrines had collapsed into barratry, which the Legislature subsequently codified as an anti-solicitation statute. *Id.* at 458-59. The Court, therefore, did not address whether Maryland retains a strong public policy against "promot[ing] litigation for the benefit of the promoter rather than for the benefit of the real party in interest" – the policy articulated by *Accrued*. Moreover, the only public policy considered in *Son* was not one based on common law maintenance-related doctrines, but rather one grounded in the Maryland Lawyers' Rules of Professional Conduct, specifically regarding fee-splitting arrangements between attorneys and non-attorneys. *See id.* at 461.

In any event, an assignee of a claim is a real party in interest with respect to that claim. *See, e.g.*, *Morton v. Schlotzhauer*, 449 Md. 217, 242 (2016) ("One is a 'real party in interest' with respect to a claim if that person has the right to assert the claim."); *Bacon & Assocs., Inc. v. Rolly Tasker Sails (Thailand) Co.*, 154 Md. App. 617, 638 (2004) ("At common law the assignee of a chose in action did not hold legal title to it and could not qualify as the real party in interest. Indeed, in large measure the real party in interest concept developed as a means of eliminating this restrictive rule. Under present law an assignment passes the title to the assignee so that he is the owner of any claim arising from

18

the chose and should be treated as the real party in interest[.]") (quoting 6A C.A. WRIGHT, A.R. MILLER & M.K. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1545, at 346). Thus, to the extent Maryland retains a policy under common law that prohibits a scheme "to stir up and promote litigation for the benefit of the promoter *rather than for the benefit of the real party in interest*[,]" *Accrued*, 298 F.3d at 299 (emphasis added), that policy, at least in general, does not apply to litigation conducted by an assignee.[12]

GEICO directs our attention to *Hernandez v. Suburban Hospital Association, Inc.*, 319 Md. 226 (1990), and *Schackow v. Medical-Legal Consulting Service, Inc.*, 46 Md. App. 179 (1980), as evidence that Maryland courts in recent times have continued to consider whether a contract should be invalidated as a product of maintenance, champerty,

---

[12] GEICO argues that the alleged unlawful assignments themselves "cannot establish an existing interest that would overcome Maryland's public policy against stirring up litigation." As its primary support, GEICO relies on the intermediate appellate court's decision in *Son*. There, the court reasoned that one accused of violating the barratry statute cannot use the alleged "barratrous contract" itself to establish an "existing relationship or interest in the issue" that would exempt the conduct from the statute's reach. *Son v. Margolius, Mallios, Davis, Rider & Tomar*, 114 Md. App. 190, 209-10 (1997), *rev'd on other grounds*, 349 Md. 441 (1998). But, as explained above, Plaintiffs' assignments do not violate BO&P § 10-604(b)(1). Accordingly, the intermediate appellate court's interpretation of the statute does not aid the analysis of the certified question presented here.

In any event, GEICO's core premise rests on a theory of champerty that Maryland has never embraced – namely, that champerty exists to prevent a third-party assignee from initiating litigation that the original claim-holder was unlikely to pursue. As discussed above, Maryland rejected the foundations of champerty long ago, explaining in *Schaferman* that champerty, one of the primary reasons why claims were not assignable at common law, was "founded upon a state of society which does not exist in this country." 28 Md. at 573; *see also* Radin at 72 (observing that, in the absence of concerns like frivolous litigation or oppressive bargains, courts have properly recognized that champertous agreements serve legitimate purposes).

or barratry. GEICO contends that these cases demonstrate the continuing viability of these common law doctrines.

It is true that this Court in *Hernandez* and the Appellate Court of Maryland in *Schackow* addressed arguments based on these common law doctrines without suggesting that their viability had eroded. Notably, in both cases, the court declined to invalidate the assignment in question. *See Hernandez*, 319 Md. at 229, 235 (patient assigned to hospital the proceeds of any recovery in personal injury case to the extent necessary to pay her hospital bill; this Court stated: "[W]e see no danger of champerty or maintenance, nor any other public policy reason to preclude the assignment of expected personal injury claim benefits to secure hospital or medical expenses actually incurred. Indeed, there is good reason to enforce such assignments."); *Schackow*, 46 Md. App. at 182, 194-96 (agreement under which consulting service provided assistance in medical malpractice case in exchange for contingent fee held not to violate doctrines of champerty and maintenance). Moreover, there is no indication that, in defending the assignments, the hospital in *Hernandez* or the consulting service in *Schackow* argued that the doctrines were no longer viable.

In this case, Plaintiffs invite us to abrogate the common law doctrines of champerty, maintenance, and barratry to the extent they continue to have any viability in Maryland. A good argument can be made for abrogation of these common law doctrines. This is especially true with respect to champerty, given the modern rule that choses in action are "generally assignable." *See Mayor & City Council of Balt. v. Thornton Mellon, LLC*, 478 Md. 396, 452 (2022) (quoting *Summers v. Freishtat*, 274 Md. 404, 407 (1975)); *Hernandez*,

20

319 Md. at 234. Today, claims are often viewed as valuable assets rather than as threats to public order. *See* Radin at 70-72. The growth of litigation financing, the widespread acceptance of contingency-fee agreements, and the debt collection industry all reflect this shift. *See generally* Victoria A. Shannon, *Harmonizing Third-Party Litigation Funding Regulation*, 36 CARDOZO L. REV. 861 (2015); Susan Lorde Martin, *Syndicated Lawsuits: Illegal Champerty or New Business Opportunity*, 30 Am. Bus. L.J. 485 (1992). The application of these ancient doctrines to modern circumstances could invalidate a broad range of legitimate contracts, harming parties acting in good faith to meet mutual interests. Some commentators have also argued that litigation financing, like the contingency fee, may increase access to justice for both individuals and organizations. Maya Steinitz, *Follow the Money? A Proposed Approach for Disclosure of Litigation Finance Agreements*, 53 U.C. DAVIS L. REV. 1073, 1085 (2019).

As noted above, there seems to be a trend toward doing away with these common law doctrines. For example, in *Maslowski v. Prospect Funding Partners LLC*, the Minnesota Supreme Court considered whether a litigation-funding agreement between Pamela Maslowski and Prospect Funding Partners LLC was void under Minnesota's common law prohibition against champerty. 944 N.W.2d at 236. Per the agreement, Prospect paid Ms. Maslowski $6,000 plus an increasing fee every six months in exchange for an interest in any settlement she received from a personal injury lawsuit; if she did not obtain a settlement, she owed Prospect nothing. *Id.*

The Minnesota Supreme Court held that the agreement was textbook champerty but also ruled that champerty was no longer a valid public policy basis for voiding contracts.

*Id.* at 238. The court explained that the doctrine of champerty, originally intended to prevent corruption and preserve the integrity of legal proceedings, is no longer necessary because the rules of professional responsibility and civil procedure prevent both attorneys and parties from profiting from frivolous litigation. *Id.* at 238-41; *accord Saladini*, 687 N.E.2d at 1226-27 (conclusion by the Supreme Judicial Court of Massachusetts that champerty is no longer needed to "protect against the evils once feared," because modern safeguards – such as rules governing contingency fees, restrictions on excessive fees, sanctions for litigation misconduct, and contract principles like unconscionability, duress, and good faith – more effectively serve that purpose); *Osprey*, 532 S.E.2d at 277-79 (Supreme Court of South Carolina's abolition of champerty as a defense).

While we agree that these common law prohibitions are teetering on obsolescence, we need not decide whether, in different circumstances, an agreement might so far exceed accepted practice that it raises public policy concerns warranting judicial intervention. *See Accrued*, 298 F.3d at 306 (Michael, J., dissenting) ("The common law, to the extent it is still viable, would … not outlaw all efforts to facilitate litigation. Rather, it would be aimed at the stirring up of a certain kind of litigation, specifically, litigation that is groundless, vexatious, or multitudinous."); *Osprey*, 532 S.E.2d at 273 ("The laws against champerty, maintenance and barratry are aimed at the prevention of multitudinous and useless lawsuits[.]").

Here, there is no such concern. Plaintiffs obtained assignments from secondary payers that allowed them to seek reimbursements allegedly owed to the secondary payers by primary payers like GEICO. While GEICO may prefer that Plaintiffs be prevented from

22

pursuing these claims, Maryland public policy does not prevent sophisticated parties like Plaintiffs and the assignors from striking a bargain they both deem valuable. Put another way, Plaintiffs' assignments are not sufficiently "officious" as to warrant invalidation.[13] And it certainly is not the case that litigation designed to recover reimbursement of Medicare payments is useless.

Because we conclude that an assignment of the right to seek and receive unpaid reimbursement of payments for expenses under 42 U.S.C. § 1395y(b)(3)(A) by way of a contingency compensation agreement is not void as against public policy, we need not address whether, if such a policy existed, it would affect the enforceability of the assignment's choice-of-law provision.[14]

---

[13] The dictionary definition of "officious" is "objectionably aggressive in offering one's unrequested and unwanted services[.]" *Officious*, Dictionary.com, available at https://perma.cc/7UNN-CB98.

[14] *Amicus Curiae* International Legal Finance Association ("ILFA") argues that "federal law, not state law, governs the assignability of the claims at issue in this case." Accordingly, ILFA contends that "any opinion about Maryland law that this Court may issue in response to the certified question would be advisory, and could not be 'determinative' of the case[.]" Based on this premise, ILFA asserts that this Court should dismiss the certified question. We decline to do so. The Maryland Uniform Certification of Questions of Law Act does not require that the answer to a Maryland question of law be determinative, only that it "may" be. The district court concluded that the answer to the certified question may be determinative. We see no reason to second-guess that determination. Moreover, we have recognized that the purpose of the certification statute "is to promote the widest possible use of the certification process in order to promote judicial economy and the proper application of Maryland's law in a foreign forum." *Proctor v. WMATA*, 412 Md. 691, 705 (2010) (citation modified). "By permitting this Court to address questions of Maryland law that are unsettled, uncertain, or otherwise controversial in light of cases decided by other courts, certification removes the need for judicial guesswork on the part of the federal courts." *Id.* (internal quotation marks and citation omitted).

## IV

## Conclusion

The reformulated certified question is:

> Whether the assignment of the right to seek and receive unpaid reimbursement of payments for expenses under 42 U.S.C. § 1395y(b)(3)(A) (2018) pursuant to a contingency compensation arrangement/agreement is void as against public policy of Maryland, and if so, whether such an arrangement/agreement is unenforceable regardless of any choice of law provision contained in such an agreement.

For the reasons stated above, we answer the first part of the question in the negative and, accordingly, decline to answer the second part of the question.

**CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY.**

24